OPINION
{¶ 1} Defendant-Appellant Matthew C. Boykin appeals from his conviction and sentence for twelve counts of Possession of Criminal Tools, following a jury trial. Boykin contends that defense counsel was ineffective in failing to request a jury instruction that would limit the purpose for which the jury could consider evidence of Boykin's prior convictions and past criminal acts. Boykin also contends that it was plain error for the trial court to have failed to give a limiting instruction regarding the other acts evidence. Even if defense counsel's failure to request a limiting instruction constituted deficient performance, we conclude that the record fails to demonstrate prejudice resulting from defense counsel's deficient performance, in view of the substantial evidence of Boykin's guilt in the record. For the same reason, we reject Boykin's contention that the trial court committed plain error when it failed to give a limiting instruction regarding the other acts evidence. Because the evidence of Boykin's guilt is strong, we conclude that it is not likely that the outcome of the trial would have been different if the trial court had given a limiting instruction regarding the other acts evidence.
 {¶ 2} Boykin also contends that defense counsel was ineffective in failing to object to verdict forms that did not comply with the requirement in R.C. 2945.75(A)(2) that they contain either the degree of the offense or the additional elements making the offense one of more serious degree. The State concedes that the verdict forms did not contain either the degree of the offense or the additional elements making the offense one of more serious degree, as required by R.C. 2945.75(A)(2), but argues that there was substantial compliance with R.C.2945.75(A)(2), which is sufficient. We disagree.
 {¶ 3} In accordance with R.C. 2945.75(A)(2), Boykin's guilty verdict constitutes a finding of guilty of the least degree of each offense charged, a first-degree misdemeanor.
 {¶ 4} Boykin also contends that defense counsel was ineffective for the following reasons: (1) he did not adequately prepare or investigate which resulted in eliciting incriminating statements from some of the State's witnesses; (2) he failed to object to the admission of the testimony of Amanda Sullivan and Stacy Hagler concerning how the use of their identification by Kelly Dixon and Mary Tuck affected their lives; (3) he failed to object to speculative responses made by Precious Morow and Kelly Dixon; (4) he failed to object to prejudicial statements made without proper foundation regarding how the counterfeit-check-cashing operation worked and recent occurrences of the check-cashing schemes as well as prejudicial statements made regarding Boykin's alleged romantic involvement with Precious Morow; (5) he delayed in his objection to hearsay testimony given by Officer William Karolyi; and (6) he failed to object to several instances of leading questions.
 {¶ 5} Boykin has failed to demonstrate that he was prejudiced by any of the alleged errors. In view of the strong, direct evidence of Boykin's guilt, there is no reasonable probability that, but for any of defense counsel's alleged errors, the outcome of the trial would have been different. We conclude that defense counsel was not ineffective.
 {¶ 6} Boykin further contends that defense counsel was ineffective in failing to object to the oath administered to the jury. We find that Boykin has failed to demonstrate that he was prejudiced by the alleged improper administration of the oath to the jury. Absent any affirmative showing of prejudice, we are unable to conclude that Boykin was denied effective assistance of counsel through the court's administration of the alleged improper jury oath and in defense counsel's failure to object to it.
 {¶ 7} Boykin contends that his conviction should be reversed, because the cumulative effect of the errors occurring at trial deprived him of his right to a fair trial. Boykin's third, fourth, and fifth assignments of error lack merit, as well as his first and second assignments of error, in part. Although we sustain Boykin's first and second assignments of error, in part, we find no cumulative error in this record of sufficient magnitude to have deprived Boykin of his right to a fair trial.
 {¶ 8} Accordingly, the judgment of the trial court is modified to reduce each of the twelve convictions to misdemeanors of the first degree, the remedy prescribed by R.C. 2945.75(A)(2) for the failure of the verdict forms to have contained either the degree of the offense, and this cause is remanded to the trial court for re-sentencing.
 I {¶ 9} One day in late June, 2002, Brad Medlin, the manager of Dot's Market in Kettering, received a call from Robert Harr, the assistant manager of Dot's Market in Bellbrook. Harr advised Medlin that two women had just cashed counterfeit checks in his store. Harr gave Medlin a description of the checks and the two women. Shortly thereafter, Medlin observed two women matching Harr's description enter the store and attempt to cash checks using the driver's licenses of Stacy Hagler and Amanda Sullivan. Medlin escorted the two women, identified as Kelly Dixon and Mary Tuck, into his office and called the police.
 {¶ 10} When Officer Jerome Cszima of the Kettering Police Department arrived on the scene, he parked in front of a blue Chevrolet Cavalier station wagon, owned by Dixon, and approached the two occupants of the vehicle, who were believed to be waiting for the return of Dixon and Tuck from the store. Precious Morow was in the front-seat passenger side, and directly behind her in the back seat, was Matthew Boykin. Behind Boykin, in the rear of the station wagon, was a baby car seat.
 {¶ 11} Sergeant William Karolyi arrived on the scene and went inside the store to talk to Medlin, Dixon, and Tuck. Dixon consented to a search of her vehicle. Officer Cszima and Sergeant Karolyi searched the station wagon, but were unable to locate additional checks. Sergeant Karolyi requested help from Morow in locating the additional checks, and Morow pointed to the baby car seat. Sergeant Karolyi found twelve counterfeit checks and a blank sheet of paper in a magazine inside the baby car seat. Boykin, Dixon, and Tuck were subsequently arrested. During an inventory search at the jail, $1,596 was found in Boykin's pants pocket.
 {¶ 12} That night, Detective Thomas Forney interviewed Boykin, and Boykin allegedly admitted his involvement in the counterfeit-check-cashing scheme. At trial, Boykin denied that he had confessed, and denied any involvement in the counterfeit-check-cashing scheme.
 {¶ 13} Boykin was indicted on twelve counts of Possession of Criminal Tools, in violation of R.C. 2923.24(A). Each count in Boykin's indictment stated that "Boykin, on or about the 26th
day of June in the year two thousand two in the County of Montgomery, aforesaid, and State of Ohio, did possess or have under his control any substance, device, instrument or article, to-wit: a check with purpose to use it criminally in the commission of a felony[.]" Boykin was found guilty by a jury of all counts of Possession of Criminal Tools, which were indicted as felonies of the fifth degree, and was sentenced to a twelve-month prison term on each count, to be served concurrently. From his conviction and sentence, Boykin appeals.
 III {¶ 14} Boykin's first and second assignments of error are as follows:
 {¶ 15} "Appellant was deprived of a fair trial, due process and effective assistance of counsel through defense counsel's failure to request and amend jury instructions.
 {¶ 16} "The trial court deprived appellant of a fair trial and due process of law by failing to properly instruct the jury."
 {¶ 17} We evaluate claims of ineffective assistance of counsel under the two-part test provided in Strickland v.Washington (1984), 466 U.S. 668. "In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, the result of the proceeding would have been different." State v. Stevens,
Montgomery App. No. 19572, 2003-Ohio-6249, at ¶ 33, citingStrickland, supra; State v. Bradley (1989),42 Ohio St.3d 136, 142, 538 N.E.2d 373.
 {¶ 18} Defense counsel's failure to object waives all but plain error. State v. Ballew, 76 Ohio St.3d 244, 251,1996-Ohio-81, 667 N.E.2d 369. Counsel's failure to object "`constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise.'" Id.
 {¶ 19} Boykin contends that defense counsel was ineffective when he failed to request a jury instruction that would limit the purpose for which the jury could consider evidence of his prior convictions and past criminal acts. Boykin also contends that the trial court erred when it failed to give a limiting instruction regarding the other acts evidence.
 {¶ 20} Boykin testified in his own defense at his trial. On direct examination, Boykin admitted that he was on federal probation, and that he had been convicted of one felony in the past ten years. Boykin also testified that Detective Thomas Forney had questioned him about his federal probation and his prior convictions. On cross-examination, the State questioned Boykin about his prior convictions and federal probation. Boykin testified as follows:
 {¶ 21} "A. I was at low income areas at first. And when I went — and when I went to prison it stopped.
 {¶ 22} "Q. When was that?
 {¶ 23} "A. Three, three and a half years maybe.
 {¶ 24} "Q. When did you go?
 {¶ 25} "A. About three and a half years, in '99.
 {¶ 26} "Q. What was the date?
 {¶ 27} "A. '99.
 {¶ 28} "Q. You don't know when?
 {¶ 29} "A. No, I was convicted in '99.
 {¶ 30} "Q. And you got out when?
 {¶ 31} "A. Two thousand and — two thousand and basically two.
 {¶ 32} * *
 {¶ 33} "Q. Okay. Now you said you went to prison?
 {¶ 34} "A. Yes ma'am.
 {¶ 35} "Q. Under what system federal or state?
 {¶ 36} "A. Federal.
 {¶ 37} "Q. Under the federal system?
 {¶ 38} "A. Yes ma'am.
 {¶ 39} "Q. And did you go for felonies?
 {¶ 40} "A. Yes ma'am.
 {¶ 41} "Q. What felonies?
 {¶ 42} "A. Checks.
 {¶ 43} "Q. Checks.
 {¶ 44} "A. Yes ma'am.
 {¶ 45} "Q. Okay tell me the name of the crime what was it?
 {¶ 46} "A. It was just a conspiracy charge to — to — to make checks.
 {¶ 47} "Q. It was what?
 {¶ 48} "A. Conspiracy.
 {¶ 49} "Q. Okay let me; let me ask you specifically to get it right. Was it conspiracy to manufacture and utter counterfeit checks?
 {¶ 50} "A. Yes ma'am.
 {¶ 51} "Q. And also another count of possession and uttering counterfeit checks. There were two counts.
 {¶ 52} "A. I don't remember you have to show me. I just know.
 {¶ 53} "Q. I don't know if this is a copy of the two counts, right here and here.
 {¶ 54} "A. That might be right but this paper is different so I don't know.
 {¶ 55} "Q. Yes, it is you're right. And it shows release May of '02. Is that right?
 {¶ 56} "A. Yes ma'am.
 {¶ 57} "Q. Now you said when you were testifying when he asked you if you had any felony convictions, I believe you said that you had one.
 {¶ 58} "A. Yes.
 {¶ 59} "Q. What one were you referring to?
 {¶ 60} "A. The ones you mention — when you're convicted in the federal they're grouped together as one offense even though they're listed same.
 {¶ 61} "Q. What about in the state system?
 {¶ 62} "A. Not in the past ten years, no ma'am.
 {¶ 63} "Q. You have no convictions in the last ten years?
 {¶ 64} "A. In the state no ma'am.
 {¶ 65} "Q. Let me ask you about case 92-CR-373377. In that case you — it's — within the last ten years because you were released in '94, July of `94 is that correct?
 {¶ 66} "A. I don't — I don't know.
 {¶ 67} "Q. You don't remember?
 {¶ 68} "A. I don't remember.
 {¶ 69} "Q. You don't remember going to prison?
 {¶ 70} "A. I remember going but I don't remember the — the time that you're speaking.
 {¶ 71} "Q. Okay, now let's separate this.
 {¶ 72} "A. Yes ma'am.
 {¶ 73} "Q. Let me make it easy for you. You've gone to federal prison?
 {¶ 74} "A. Yes ma'am.
 {¶ 75} "Q. And you've gone to state prison.
 {¶ 76} "A. Yes ma'am.
 {¶ 77} "Q. So those would be two different cases.
 {¶ 78} "A. Right.
 {¶ 79} "Q. Okay. Now do you remember the state case?
 {¶ 80} "A. Yes ma'am.
 {¶ 81} "Q. Okay. So that was for what?
 {¶ 82} "A. I can't remember that.
 {¶ 83} "Q. You don't remember what you're convicted for?
 {¶ 84} "A. I remember what I went for, it couldn't be forgery, I don't remember. I can't tell you the inmate number.
 {¶ 85} "Q. I don't want to know the inmate number. I want to know what you were convicted of.
 {¶ 86} "A. If anything it was probably forgery.
 {¶ 87} "Q. Do you know what uttering is?
 {¶ 88} "A. Yes ma'am, I heard it speak what —
 {¶ 89} "Q. Wait did you know before?
 {¶ 90} "A. Yes.
 {¶ 91} "Q. You knew before you came in here what uttering was?
 {¶ 92} "A. Yes ma'am.
 {¶ 93} "Q. And when the girls passed checks you knew that uttering was a felony?
 {¶ 94} "A. Yes.
 {¶ 95} * *
 {¶ 96} "Q. Okay. Now, the other thing I wanted to make sure we got right. You said you were on Federal Probation. That's not correct is it?
 {¶ 97} "A. Yes.
 {¶ 98} "Q. You're on Federal Parole.
 {¶ 99} "A. It's probation.
 {¶ 100} "Q. Probation is what you get when you don't go to prison. Parole is what you get when you come out of prison.
 {¶ 101} "A. No, it's Federal probation. You look at his card, you've talked to him before, and you know its Federal probation, his name is Mr. Adam's Federal Probation Officer.
 {¶ 102} "Q. Adam's is a Probation Officer. But you are on parole.
 {¶ 103} "A. I'm on probation. I don't believe the Federal system has any parole.
 {¶ 104} * *
 {¶ 105} "Q. Let me ask you this way. You are being supervised by Mr. Adam's correct?
 {¶ 106} "A. Yes ma'am.
 {¶ 107} "Q. And you're being supervised after your release from prison. Correct?
 {¶ 108} "A. Yes ma'am.
 {¶ 109} * *
 {¶ 110} "Q. And then he [Detective Forney] asked you if you were on Federal probation. He asked you that?
 {¶ 111} "A. Right.
 {¶ 112} "Q. You didn't tell him that?
 {¶ 113} "A. No, he knew.
 {¶ 114} "Q. He asked you?
 {¶ 115} "A. Yes."
 {¶ 116} While testifying, Trista Douglas, Boykin's wife, mentioned a few different times that Boykin had been in jail before. Douglas's testimony also indicated that she was involved in a scam with Boykin in which Boykin was living in low income housing with her without his name on the lease. Sandra Lewis, a close friend of Boykin's, also mentioned a few different times in his testimony that Boykin went to jail and was on parole for a crime involving counterfeit checks. Detective Thomas Forney's testimony briefly addressed Boykin's prior case and Boykin's federal probation. There was other testimony by Brad Medlin, Officer William Karolyi, and Detective Thomas Forney about how the counterfeit-check-cashing operation worked and recent occurrences of the check-cashing schemes at Dot's Market in Bellbrook and Kroger stores in Kettering. "The courts in Ohio have long recognized that evidence of other crimes, wrongs or bad acts carries the potential for the most virulent kind of prejudice for the accused. That is even more true in a case such as this where the other acts involve conduct similar or identical to the offense charged. In cases where evidence has been admitted for a very limited purpose and that evidence tends to show that Defendant has committed other criminal acts, the jury should be instructed that such evidence must not be considered by them as proof that defendant committed the crime charged. The limiting instruction should be given at the time the `other acts' evidence is received, and it has been held that the failure to give any limiting instruction constitutes plain error.
 {¶ 117} "While this court has recognized that a defendant is entitled to an appropriate instruction limiting the scope of a jury's consideration of potentially prejudicial evidence that is admitted for a very limited purpose, we have also recognized that a defendant may decide, as a matter of trial strategy, not to request a limiting instruction because of concerns that it will only emphasize in the juror's minds the evidence of other criminal acts committed by defendant to which the instruction applies, thereby reinforcing the prejudice." State v. Tisdale,
Montgomery App. No. 19346, 2003-Ohio-4209, at ¶¶ 47-48, internal citations omitted.
 {¶ 118} We need not decide in this case whether defense counsel's failure to request a limiting instruction was legitimate trial strategy or constitutionally deficient performance. Even if defense counsel's failure to request a limiting instruction constituted deficient performance, the record does not demonstrate prejudice resulting from defense counsel's deficient performance, in view of the substantial evidence of Boykin's guilt.
 {¶ 119} The evidence of Boykin's guilt in this case includes the testimony of Precious Morow, Brad Medlin, Officer Jerome Cszima, Sergeant William Karolyi, Kelly Dixon, Mary Tuck, and Detective Thomas Forney.
 {¶ 120} Precious Morow testified that she heard Boykin ask Dixon and Tuck to cash checks, and that Dixon and Tuck agreed because they were pregnant and homeless. Morow testified that she went with Boykin, Dixon, and Tuck to Dot's Market in Bellbrook on June 26, 2002, where Dixon and Tuck went into the store to cash checks. Morow testified that Boykin kept the checks in a newspaper or magazine and opened it and had Dixon and Tuck take a check out to avoid getting his fingerprints on the checks. Morow testified that when Dixon and Tuck came out of Dot's Market they had money, and that they gave the money to Boykin who put the money in his pocket. Morow stated that Boykin would give them each a hundred dollars, but at the end rather than after each check was cashed. Morow testified that they then went to Dot's Market in Kettering, where Boykin gave Dixon and Tuck more checks, and Dixon and Tuck went in to cash the checks. Morow testified that when Dixon and Tuck did not come out of the store, Boykin asked her to throw the checks away in trash cans by the store but she refused. Morow further testified that she saw Boykin turned around and put the checks in a baby car seat that was located in the rear of the car. Morow testified that when the police asked her where the checks were she pointed to the baby car seat. Morow's testimony was corroborated by the testimony of Brad Medlin, Officer Jerome Cszima, and Sergeant William Karolyi. Medlin testified that after detaining Dixon and Tuck, he exited the store and walked through the parking lot looking for a blue Chevy Cavalier station wagon as described by Dixon, Tuck, and Robert Harr, assistant manager at Dot's Market in Kettering. Medlin testified that he located a car matching the description, walked past the car, and observed Boykin in the back seat on the right side and Morow in the front seat passenger side. Medlin further testified that Boykin "was reaching like over his shoulder behind himself, halfway turned around I guess. Doing something in what would be the rear end of the car." Medlin testified that after the police arrived, he observed the police remove "a lump of money" from Boykin's pocket and observed the police remove checks from a baby car seat that was located in the rear of the car. Medlin further testified that the baby car seat was located in the rear of the car within the reach of Boykin from where he had been positioned in the car.
 {¶ 121} Officer Jerome Cszima testified that Boykin was in the back seat on the right side, and the baby car seat was right behind Boykin in the rear of the station wagon sitting on top of things. Officer Cszima also testified that checks were found in the baby car seat. Officer Cszima further testified that after Boykin was arrested, he was taken to the jail where an inventory search was conducted and $1,596 in cash was found in Boykin's pocket. Officer Cszima testified that no cash was found on Dixon, Tuck, or Morow.
 {¶ 122} Sergeant William Karolyi testified that he observed Boykin in the back seat, and that a baby car seat was located behind Boykin. Sergeant Karolyi testified that Dixon and Tuck told him that Boykin had the checks, but Sergeant Karolyi was unable to locate the checks until he spoke with Morow and she pointed to the baby car seat. Sergeant Karolyi testified that he discovered a magazine, a pile of checks, and some blank white paper in the baby car seat. Sergeant Karolyi further testified that from where Boykin was sitting in the car, he could have turned and hidden the checks in the baby car seat. Specifically, Sergeant Karolyi stated that Boykin "could have turned or actually probably reached right over his head because the seat was right behind his head he wouldn't have even had to turn around to do so."
 {¶ 123} In addition, the testimony of Kelly Dixon, Mary Tuck, and Detective Forney provided evidence of Boykin's guilt. Dixon testified that Boykin asked her and Tuck if they wanted to cash counterfeit checks, and she agreed because she was pregnant, homeless, and needed money. She testified that Boykin would keep the checks in a newspaper or magazine. Dixon further testified that she drove Boykin, Tuck, and Morow to Dot's Market in Bellbrook, where she got a check from Boykin and went in to the store to cash the check. Dixon testified that she gave Boykin the money she received from cashing the check at the Dot's Market in Bellbrook. Dixon also testified that when they went into Dot's Market in Kettering to cash a check, the manager came over, took the checks, and told them they could do it the easy way or the hard way. Dixon stated that she told the manager that "[t]he person who gave me the checks was in my car and the checks were out there too." Dixon testified that after the police showed up, she told the police that Boykin was in charge of the check cashing. Mary Tuck testified that Boykin asked her if she was interested in cashing payroll checks made off the computer, and she agreed because she needed money since she was pregnant and was being kicked out of her home. Tuck testified that she would get all the checks from Boykin and that he was in charge. Tuck testified that Boykin would always cover the checks with a sheet of paper and then put them in a book. Tuck stated that Boykin would never touch the checks. Tuck testified that after cashing the check, she was to give Boykin the cash before taking her portion of the money, and that sometimes Boykin would wait until the end, when he had all the money in his pocket, to give her part of the money. Tuck also testified that Boykin would always hide the checks in the baby car seat. Tuck stated that on June 26, 2002, Boykin gave her a check to cash at Dot's Market in Bellbrook, she cashed the check, and then gave the cash to Boykin and he put it in his pocket. Tuck stated that she then went with Boykin, Dixon, and Morow to Dot's Market in Kettering, and she and Dixon went in to try to cash a check given to them by Boykin, but were told they were bad checks.
 {¶ 124} Detective Thomas Forney testified that he had interviewed Dixon and Tuck and taken a written statement from them. Detective Forney testified that their written statements were consistent with their testimony at Boykin's trial. Detective Forney also testified that after interviewing Dixon, Tuck, and Boykin, all three interviews were consistent with each other. Detective Forney testified that after reading Boykin his Miranda rights, Boykin told him that "he had met both the defendants Mary Tuck and Kelly Dixon approximately three weeks earlier, sometime around early June, and that he had approached both to see if they were interested in cashing checks." Detective Forney testified that Boykin also told him that "[a]fter they both agreed to cash checks, he advised that he told them that they would earn approximately fifty dollars for a check that had a face value of less than four hundred dollars, and any check over four hundred dollars he would pay them one hundred dollars for each check that they cashed." Detective Forney testified that he determined that Boykin's purpose in being with Morow, Dixon, and Tuck at Dot's Market "was to supply them with the checks so they could cash them, and then he would receive the money, he would pay them, and then with the rest of the money, collectively he would go back and pay his supplier and then take his cut of the money." Detective Forney also testified that Boykin knew the checks were counterfeit, and that Boykin told him "he was supplying checks."
 {¶ 125} In view of the strong and direct evidence of Boykin's guilt in this record, we cannot say that there exists a reasonable probability that Boykin would have been acquitted had defense counsel requested a limiting instruction regarding the other acts evidence. Therefore, ineffective assistance of counsel has not been demonstrated on this record.
 {¶ 126} For the same reason, we reject Boykin's contention that it was plain error for the trial court to have failed to give a limiting instruction regarding the other acts evidence. Because Boykin failed to request this jury instruction in the trial court, he waived all but plain error. State v. Williams,
Montgomery App. No. 16715, 1999 WL 129488, at *5, citation omitted. Because the evidence of Boykin's guilt is strong and direct, we conclude that it is not likely that the outcome of the trial would have been different if the trial court had given a limiting instruction regarding the other acts evidence.
Boykin contends that defense counsel was also ineffective when he failed to request an amendment to an improper criminal tools instruction, which failed to describe the applicable felony. Boykin argues that defense counsel's failure to request an amendment to the criminal tools instruction that described the applicable felony deprived him of his right to notice of the charges made against him by grand jury indictment and his right to an unanimous verdict. Boykin also contends that the defense counsel was ineffective when he failed to object to verdict forms that did not comply with R.C. 2945.75(A)(2). Because the verdict forms did not comply with R.C. 2945.75(A)(2), Boykin argues that the guilty verdict constitutes a finding of guilty of the least degree of each offense charged, a first-degree misdemeanor. Boykin incorporates these arguments into his second assignment of error in contending that the trial court also erred when it failed to properly instruct the jury.
 {¶ 127} Boykin was charged with twelve counts of Possession of Criminal Tools, in violation of R.C. 2923.24(A), which states that "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." R.C. 2923.24(C) provides, in pertinent part, that "[e]xcept as otherwise provided in this division, possessing criminal tools is a misdemeanor of the first degree. If the circumstances indicate that the substance, device, instrument, or article involved in the offense was intended for use in the commission of a felony, possessing criminal tools is a felony of the fifth degree." Each count in Boykin's indictment stated that "Boykin, on or about the 26th day of June in the year two thousand two in the County of Montgomery, aforesaid, and State of Ohio, did possess or have under his control any substance, device, instrument or article, to-wit: a check with purpose to use it criminally in the commission of a felony[.]" Thus, Boykin was charged with twelve counts of felony Possession of Criminal Tools.
 {¶ 128} R.C. 2945.75(A)(2) states as follows:
 {¶ 129} "When the presence of one or more additional elements makes an offense one of more serious degree * * * [a] guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes afinding of guilty of the least degree of the offense charged." (Emphasis added.)
 {¶ 130} Boykin was found guilty of all twelve counts, and each verdict form contained the following language: "We, the jury, upon the issues joined in this case, do find the Defendant, MATTHEW C. BOYKIN, guilty of POSSESSION of CRIMINAL TOOLS for Check Number * * * in violation of § 2923.24(A) of the Ohio Revised Code." The verdict forms did not meet the requirements of R.C. 2945.75(A)(2), because they did not state the degree of the offense of which Boykin was found guilty or that the additional elements are present.
 {¶ 131} The State concedes that the verdict forms did not contain either the degree of the offense or the additional elements making the offense one of more serious degree pursuant to R.C. 2945.75(A)(2). The State argues that failure to strictly comply with R.C. 2945.75(A)(2) does not constitute reversible error, because there was substantial compliance with R.C.2945.75(A)(2) in the sense that the jury was instructed that the purpose to use the checks criminally was an essential element. The State also argues that the record supports that the jury considered whether Boykin intended to use the checks in the commission of a felony and found that element to exist. We disagree.
 {¶ 132} The State relies on State v. Burrow (2000),140 Ohio App.3d 466, 470, 748 N.E.2d 95, which held that "Ohio courts have ruled that, under certain circumstances, verdict forms like the one in this case may still be deemed to have substantially complied with the enhancement statute. In State v. Woods
(1982), 8 Ohio App.3d 56, 8 OBR 87, 455 N.E.2d 1289, the court found that the failure to strictly comply with R.C. 2945.75 did not constitute reversible error where the verdict form incorporated the language of the indictments, the evidence overwhelmingly showed the presence of aggravating circumstances, and the defendant failed to object at trial to the form of the verdict. Other courts have found substantial compliance with R.C.2945.75 where the indictment was read to the jury or the language of the offense was included in the charge to the jury. See Statev. Hawkins (1997), 120 Ohio App.3d 277, 697 N.E.2d 1045; Statev. Davis (Jan. 27, 1992), Ross App. No. 1746, unreported, 1992 WL 21228. `[T]he findings of statutory compliance hinge on the fact that the jury was read the indictment or was otherwise instructed on the proper elements of the offense by the trial court.'"
 {¶ 133} In Burrow, the court further held that "the felony-enhancement language of the indictment properly supplied the enhancement element: `a firearm loaded or with ammunition ready at hand' See R.C. 2923.12(D). But the verdict form did not contain the degree of the offense or the felony-enhancement language. Nor did the verdict form incorporate the language of the indictment. While the trial court read the indictment to the jury, it did not further instruct the jury on the felony-enhancement element. Thus, the court gave the jury a meaningful opportunity to find Burrow guilty only of the misdemeanor offense of carrying a concealed weapon. * * * We are persuaded that, but for the failure to act on the omission in the verdict form, the outcome of the trial would have been different with respect to the degree of the offense for which Burrow was convicted." Id.
 {¶ 134} The indictment in this case includes the additional element, "in the commission of a felony," although it does not describe the felony. As in Burrow, the verdict form in this case does not contain the degree of the offense or the additional element making the offense one of more serious degree. Nor does the verdict form incorporate the language of the indictment. While the trial court read the indictment to the jury, it did not further instruct the jury on the additional "in the commission of a felony" element. The record does show that the trial court instructed the jury that "[i]f you're verdict is guilty, * * * you will then separately determine as to each check or each count whether the State has proven beyond a reasonable doubt that the defendant possessed the instrument, that being a check, to commit a felony." However, this instruction fails to instruct the jury to find that the "in the commission of a felony" element was met before finding Boykin guilty, and does not further instruct the jury on the additional element.
 {¶ 135} Similarly to Burrow, the trial court in this case gave the jury a meaningful opportunity to find Boykin guilty only of the misdemeanor offense. By leaving out the "in the commission of a felony" element from the verdict form, the trial court effectively removed this element from the jury's consideration. The jury was not given an opportunity to make an express finding whether the alleged criminal tools were used in the commission of a felony, and we cannot say that this error, which seems like a structural error in the sense that it deprived Boykin of his right to a jury trial on that issue, was harmless. Furthermore, R.C. 2945.75(A)(2) prescribes the remedy where its requirement is not complied with: the guilty verdict constitutes a finding of guilty of the least degree of each offense charged — a first-degree misdemeanor. We conclude that based on the record, the trial court did err by failing to provide the jury with a verdict form in compliance with the statute, and ineffective assistance of counsel has been demonstrated.
 {¶ 136} Therefore, Boykin's first and second assignments of error are overruled with respect to defense counsel's failure to request a limiting instruction as to other acts evidence, and the trial court's failure to give a limiting instruction as to other acts evidence. Boykin's first and second assignments of error are sustained with respect to the verdict forms not complying with R.C. 2945.75(A)(2).
 III {¶ 137} Boykin's third and fourth assignments of error are as follows:
 {¶ 138} "Appellant was denied effective assistance of counsel and a fair trial through counsel's incrimination of appellant without sound trial strategy.
 {¶ 139} "Appellant was denied effective assistance of counsel through counsel's failure to object to the admission of prejudicial evidence."
 {¶ 140} Under his third and fourth assignments of error, Boykin contends that defense counsel's representation was ineffective in several respects.
 {¶ 141} Boykin first contends that defense counsel was ineffective, because he did not adequately prepare or investigate which resulted in eliciting incriminating statements from some of the State's witnesses. Boykin contends that defense counsel elicited incriminating statements when he asked Officer Karolyi if Boykin was a suspect in other similar cases of counterfeit check cashing, and Officer Karolyi responded that he was. Boykin also contends that incriminating statements were elicited when defense counsel asked Officer Karolyi where those other cases were, and Officer Karolyi responded that they were at two different Kroger stores and "[i]t was the same MO, where two females had came into the store to pass them." Boykin contends that defense counsel elicited incriminating statements from Morow when he asked her if Boykin had handed her the check or had her take one, and she responded that Boykin had her take one. Boykin further contends that incriminating statements were elicited from Morow when defense counsel asked her if she actually saw Boykin turn around and put the checks in the baby car seat, and she stated that she had. Boykin contends that incriminating statements were elicited from Tuck when defense counsel asked her where she had obtained her fake identification, and Tuck responded that she got it from Boykin.
 {¶ 142} "The manner and style of questioning a witness is a trial tactic and does not amount to ineffective assistance of counsel." In re Slone, Montgomery App. No. 18405, 2000 WL 1867585, at *5. A defendant is not denied effective assistance of counsel even where "debatable trial tactics" are used by defense counsel. Id., citing State v. Clayton (1980), 62 Ohio St.2d 45, 16 O.O.3d 35, 402 N.E.2d 1189.
 {¶ 143} We find no evidence in the record that defense counsel was inadequately prepared. To the contrary, when defense counsel's cross-examination is read in its entirety, it is evident that defense counsel was adequately prepared. Defense counsel elicited favorable testimony for Boykin from Officer Karolyi, attempted to impeach the credibility of Morow and Tuck by implying that they were lying about Boykin's involvement in the counterfeit-check-cashing scheme, and revealed inconsistencies between the testimony of Morow, Tuck, and Dixon.
 {¶ 144} Even if defense counsel's questions elicited incriminating statements constituting deficient performance, we conclude that there is no reasonable probability that, but for defense counsel's questions to the State's witnesses, the result of the proceedings would have been different. Based on the evidence previously reviewed in Part II, above, the evidence of Boykin's guilt is strong and direct. Therefore, we conclude that defense counsel was not ineffective in his questioning of the State's witnesses.
 {¶ 145} Boykin also contends that defense counsel was ineffective in failing to object to the admission of the testimony of Amanda Sullivan and Stacy Hagler concerning how the use of their stolen identities by Dixon and Tuck affected their lives. Sullivan testified that it affected her family life and her ability to get a job as well as her ability to go out in public, because she was on Miami Valley's Most Wanted list. Hagler testified that it affected her family life and her ability to get a job and adopt a child. Boykin argues that these statements by Sullivan and Hagler tended to lead the jury to convict him based upon emotion rather than evidence of guilt.
 {¶ 146} Regardless of whether this is so, trial counsel may not have objected to these statements to avoid drawing attention to them or appearing insensitive to the jury. Reasonable tactical decisions like these will not form the basis of a reversal for ineffective assistance of counsel. See State v. Parker,
Montgomery App. No. 19486, 2003-Ohio-4326, at ¶ 20. In addition, we conclude that the outcome of the trial would not have been different had defense counsel objected to these statements. Therefore, we conclude that defense counsel was not ineffective in his failure to object to these particular statements made by Sullivan and Hagler in their testimony.
 {¶ 147} Boykin also contends that defense counsel was ineffective when he failed to object to speculative responses made by Morow and Dixon. When asked where the money in Boykin's pocket came from, Morow testified that "[h]e had money before anything was cashed or whatever and I'm assuming the rest of it came from when they had got the check off in Bellbrook." When asked if Boykin touched the check, Dixon stated that "[y]ou know I never paid attention to if he touched them, but they were always in his possession. Maybe he handed it to us in a way where he didn't touch them I'm not sure." Boykin contends that these responses invited the jury to convict based on speculation.
 {¶ 148} The responses from Morow and Dixon were not speculative. Morow's assumption is logical given her prior testimony that she saw Dixon and Tuck hand Boykin money after coming out of Dot's Market in Bellbrook, where they cashed the checks, and then saw Boykin put the cash in his pocket. In Dixon's testimony, she stated that she "never paid attention" and wasn't sure if Boykin handed the checks to her in a way that he didn't touch them. She did not speculate that he did not touch them, but stated that she wasn't sure. In addition, we are satisfied that the outcome of the trial would not have been different had defense counsel objected to these statements. Therefore, we conclude that defense counsel was not ineffective in his failure to object to these particular statements made by Morow and Dixon in their testimony.
 {¶ 149} Boykin contends that defense counsel was ineffective when he failed to object to prejudicial statements made without proper foundation regarding how the counterfeit-check-cashing operation worked and recent occurrences of the check-cashing schemes as well as prejudicial statements made regarding Boykin's alleged romantic involvement with Morow.
 {¶ 150} Boykin contends that defense counsel was ineffective in failing to object to Medlin's testimony, which was admitted without foundation as to his alleged experience. Brad Medlin testified that "[t]here was only one officer there at that time. I was trying to explain to him from my past experience what I knew to be — how these people operated as far as what they do. Which is one individual that's responsible that carries the checks that distributes it to these people, makes them go in or has them go in and cash, they split the money. I explained it to him, I said, you know, we need to try to look through this car, because there's a good chance were going to find the checks. Detective Forney is working with me on this and so he talked about that whole scenario." However, Medlin's experience was based on his testimony that he had been working with Detective Forney who explained the whole scenario to him, and that "these people have been hitting us," i.e., his past experience.
 {¶ 151} Boykin contends that defense counsel was ineffective in failing to object to Officer Karolyi's testimony, which was admitted without a proper foundation. Officer Karolyi testified that when he arrived at the scene, he "had a little bit of background information on the call being that [he] was on a similar call just two days prior." Officer Karolyi also testified that he told Officer Cszima that "it was the same vehicle that was in a similar type of offense two days prior to a Kroger store in the City of Kettering that I handled[.]" In both of these statements, Officer Karolyi stated that he was "on a similar call" and that he "handled" the case that happened two days before. Officer Karolyi's testimony was based on his own firsthand knowledge and experience. In addition, Officer Karolyi's testimony did not necessarily implicate Boykin. The only connection was the vehicle, which the record shows was linked to Kelly Dixon, not Boykin.
 {¶ 152} Boykin contends that defense counsel was ineffective in failing to object to testimony regarding his alleged romantic involvement with Morow. Boykin cites testimony by Morow where she testified that she was seeing Boykin, and that they were "a little bit more than a [sic] friends." However, this testimony was elicited on cross-examination by defense counsel. Thus, defense counsel was not ineffective for failing to object to his own questioning. Boykin further cites cross-examination by the State where the State implies a romantic relationship between Boykin and Morow. Given that defense counsel first addressed Boykin's romantic relationship with Morow, it is reasonable that the relationship was addressed to display a bias on the part of Morow, thus, impeaching Morow's credibility. We cannot conclude that defense counsel was ineffective for failing to object to the State's questions implying a romantic involvement between Boykin and Morow.
 {¶ 153} We also conclude that the outcome of the trial would not have been different had defense counsel objected to Medlin's statements, Officer Karolyi's statements, or the State's line of questioning regarding Boykin's relationship with Morow. Therefore, we conclude that defense counsel was not ineffective in his failure to object to these particular questions and statements.
 {¶ 154} Boykin contends that defense counsel was ineffective when he delayed in his objection to hearsay testimony given by Officer Karolyi. Officer Karolyi testified that "Brad told me — I really didn't question them, Brad said they admitted to him that the subject, the male subject out in the car supplied the checks to them, took them around to the stores. They cashed them; they got a percentage of the actual check they cashed. They also told Brad that the subject in the car — [.]" Defense counsel then objected, and the trial court sustained the objection. Assuming that defense counsel should have made a more timely objection to the improper hearsay evidence, we agree with the State that Boykin has failed to show that there is a reasonable probability that, but for defense counsel's errors, the result of the trial would have been different.
 {¶ 155} Finally, Boykin contends that defense counsel was ineffective in failing to object to several instances of leading questions and cites to ten transcript page numbers. Boykin identifies only three questions on three different pages. Our review of all of these pages reveals no questioning that could have prejudiced Boykin. Accordingly, we do not find that counsel was ineffective in failing to object.
 {¶ 156} Boykin's third and fourth assignments of error are overruled.
 IV {¶ 157} Boykin's fifth assignment of error is as follows:
 {¶ 158} "Appellant was denied due process, equal protection, a fair trial, and effective assistance of counsel through the court's administration of an improper jury oath and counsel's failure to object to it."
 {¶ 159} Boykin contends that defense counsel was ineffective in failing to object to the oath administered to the jury.
 {¶ 160} R.C. 2945.28 states that "[i]n criminal cases jurors and the jury shall take the following oath to be administered by the trial court or the clerk of the court of common pleas: `You shall well and truly try, and true deliverance make between the State of Ohio and the defendant (giving his name). So help you God.'"
The record shows that the oath administered to the jury was as follows:
 {¶ 161} "THE BAILIFF: Ladies and gentlemen would you please stand and raise your right had [sic]. Do you solemnly swear that you will listen to the evidence in the case of Matthew C. Boykin? Indicate I do.
 {¶ 162} "JURORS: I do."
 {¶ 163} Defense counsel did not object to the oath at the time it was administered to the jury. Boykin argues that this is not the oath customarily administered to a jury, and it omits reference to the jurors' obligation to render a true verdict.
 {¶ 164} "[T]he Ohio Supreme Court declined to hold that irregularities in the administration of oaths or affirmations to a jury constitute per se reversible error; rather, the court held that where counsel had the opportunity at the time to bring to the attention of the court any irregularities but failed to do so, and in the absence of any affirmative showing of prejudice on the record, an otherwise valid judgment of conviction will not be reversed." State v. Vanblarcome, Franklin App. No. 02AP-417, 2003-Ohio-579, at ¶ 21, citing State v. Glaros (1960),170 Ohio St. 471, 480, 11 O.O.2d 215, 166 N.E.2d 379.
 {¶ 165} In this case, Boykin contends that "he was prejudiced through the Court's failure to administer the oath and Defense Counsel's failure to object to the omission, despite the fact that such prejudice is difficult to prove at this juncture." We find that Boykin has failed to demonstrate that he was prejudiced by the alleged improper administration of the oath to the jury. The record indicates that the trial court's jury instructions emphasized the jurors' "sworn duty" to accept the instructions given as well as the importance of the jurors' role in being the "sole judges of the facts, the credibility of the witness and the weight of the evidence." See id. at ¶ 22. There is also no indication that the jurors did not believe they were properly sworn, or that they failed to appreciate the importance of the oath. See id. Absent any affirmative showing of prejudice, we are unable to conclude that Boykin was denied effective assistance of counsel through the court's administration of an alleged improper jury oath and in defense counsel's failure to object to it.
 {¶ 166} Boykin's fifth assignment of error is overruled.
 V {¶ 167} Boykin's sixth assignment of error is as follows:
 {¶ 168} "The cumulative effect of the errors occurring at trial deprived appellant of a fair trial."
 {¶ 169} Boykin contends that his conviction should be reversed, because the cumulative effect of the errors occurring at trial deprived him of his right to a fair trial. As noted above, however, Boykin's third, fourth, and fifth assignments of error lack merit as well as his first and second assignments of error, in part. Boykin was not deprived of a fair trial due to ineffective assistance of counsel, because defense counsel was not ineffective for failing to request a limiting instruction regarding other acts evidence. Boykin was also not deprived of a fair trial, because the trial court did not err in failing to give a limiting instruction regarding other acts evidence. Boykin was not deprived of a fair trial due to ineffective assistance of counsel, because defense counsel was not ineffective in eliciting incriminating statements from the State's witnesses. Boykin was not denied effective assistance of counsel through defense counsel's failure to object to the admission of prejudicial evidence. Finally, Boykin was not deprived of a fair trial, because Boykin was not denied effective assistance of counsel through the court's administration of an alleged improper jury oath and in defense counsel's failure to object to it.
 {¶ 170} Although we have sustained Boykin's first and second assignments of error, in part, we find no cumulative error in this record of a magnitude that would have deprived Boykin of his right to a fair trial. Boykin's sixth assignment of error is overruled.
 VI {¶ 171} Boykin's third, fourth, fifth, and sixth assignments of error having been overruled, and his first and second assignments of error having been overruled in part and sustained in part, the judgment of the trial court is modified by reducing the degree of the offenses of which Boykin has been convicted from fifth-degree felonies to first-degree misdemeanors, and this cause is remanded for re-sentencing, accordingly.
Wolff and Grady, JJ., concur.