[Cite as *State v. Kelley*, 2012-Ohio-1095.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                          :            C.A.
                               CASE NO.   2011 CA 37

v.                                               :

                                      T.C. NO.   10CR831

TYRONE KELLEY                                    :            (Criminal appeal from
                                       Common Pleas Court)

    Defendant-Appellant                          :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    16th    day of     March    , 2012.

. . . . . . . . . .

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
        Attorney for Plaintiff-Appellee

ADAM JAMES STOUT, Atty. Reg. No. 0080334, 2533 Far Hills Avenue, Dayton, Ohio 45419
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    This matter is before the Court on the Notice of Appeal of Tyrone Kelley, filed May

16, 2011.

**{¶ 2}** On December 13, 2010, Kelley was indicted on one count of burglary, in violation of R.C. 2911.12(A)(4), a felony of the fourth degree. On February 15, 2011, Kelley filed a notice of alibi, which alleged that he was at the home of Yumashita Murray at the time of the offense. Kelley was convicted by jury of the indicted charge, and he was sentenced to a one year term of imprisonment.

**{¶ 3}** At trial, Katherine Rieske testified that at the time of the offense, she resided at 1018 West Columbia Street in Springfield, across the street from the home of the victims, Hansel and Joan Kirkland, who resided at 1015 West Columbia Street. Rieske testified that on August 1, 2010, at approximately 9:45 a.m., she was sitting on her front porch smoking a cigarette. She observed "a black male coming from the back of [Kirkland's] home down the side of the fence * * *." Rieske continued

> I noticed him bending down to one of their basement windows. I saw him remove a screen, set it to the side. He stuck his body down in, I was assuming, to see if he could maybe fit through the window.
>
> And at that point in time, I knew he wasn't supposed to be there, and I yelled at him, and he came up. And as he came up, he turned and looked directly at me, and he took off running back from the direction where he came from.

**{¶ 4}** Rieske stated that from her perspective she believed that the suspect was "about six-foot, six-one, about 185 to 190 pounds" and in his late thirties or early forties. She described him as dark-skinned and thin, and she testified that he wore black pants and "a very nice, maybe football, baseball jersey. It had yellow and black on it." Rieske stated that he also wore a yellow

and black ball cap. According to Rieske, "* * * When he came back up from what I assumed was trying to see if he could fit through the window, I did not see the hat anymore. But when the police came, they didn't find the hat either, so I'm assuming that he had picked up the hat."

{¶ 5} Rieske stated, "At first when I saw him bending down, the air conditioner was in the way; and as I saw him removing the screen, he kind of came back up. And as he then stood up, I yelled and said, 'Hey, what are you doing?' And that's when he began to take off running." Rieske stated that she yelled for her boyfriend, who was inside her home, and they tried to follow the suspect but could not locate him. Rieske testified that she had never seen the suspect before, and she was unable to identify him in a photo spread. After observing Kelley in a standing position in the courtroom, Rieske stated that his appearance was consistent with that of the suspect she observed in the Kirkland's yard.

{¶ 6} On cross-examination, Rieske stated that she has bipolar disorder and ADHD, and a prior conviction for misdemeanor theft. She was then asked the following series of questions regarding the photo spread she was shown:

Q. And you see in the photo up in the top, right-hand corner that's identified as number three, correct?

A. Yes, sir.

Q. When you look at that photo there and you look at the individual seated back here, it's the same person, right?

A. I would say yes.

Q. Not only is it the same person, but you can see that Mr. Kelley has a pretty prominent bulge on the left side of his face?

A. Yes.

Q. Not on the photo, but as he sits in the courtroom this afternoon, you can see that's pretty prominent on the left side of his face?

* * *

A. Yes, I see the knot on his face.

{¶ 7} Officer Jerry Klark, of the Springfield Police Division, testified that he and Officer Jerry Bowen were dispatched to the Kirklands' home on the date of the incident. Klark stated that he examined the window at issue, and he stated, the "screen was removed from the window. The window was pushed in." When asked if the window was damaged, Klark responded, " * * * I believe I took photos of it, but I can't quite recall exactly. I believe part of the framing of the window, when you push it in, was broken on it." When asked about the way the window opens, Klark stated, it "only goes in."

{¶ 8} Klark testified that he photographed the scene, and he identified the photographs that he took. After he took the photos, Klark testified that he obtained six sets of latent fingerprints "from the window and the screen."

{¶ 9} On cross-examination, the following exchange occurred regarding Klark's photographs:

Q. * * * The State's Exhibit # 2 that you looked at, a couple things I want to have you point out to the jury. One, directly in front of that window is an air-conditioner unit; is that correct?

A. Right.

Q. If you're standing on Columbia Avenue, if you're looking from

Columbia Avenue back towards the back of the house, that air-conditioner unit would be between whoever is standing on Columbia Avenue and the window, correct?

A. Yes.

Q. On the other picture that's on the bottom there that shows a window, that doesn't show damage to the window, correct?

A. Well, it's hard to tell. This is back in August. I can't recall where the damage was at. You probably have to ask the owner for that.

Q. But my question is, that picture doesn't show any damage to the window, right?

A. Right. It's just pushed in.

{¶ 10} Regarding the fingerprints Klark obtained, he described the process he employs to lift the prints, and he indicated that he retrieved the prints from a "screen and window frame."

{¶ 11} On re-direct examination, the following exchange occurred regarding the photos in State's Exhibit # 1:

Q. * * * the point of reference from 1018 West Columbia across the street, does that give you a better angle of the window than if you were straight ahead from the house? * * *

A. You should be able to see. I mean, this is 1018 here, and this is the side of the house. So you can be standing on that porch and see that whole length of the house.

{¶ 12} Officer Bowen testified that when he responded to the scene, he "found a window

that had been pushed down into the house. The screen was removed and the window was in." Bowen compiled a police report after speaking with Rieske.

{¶ 13} Mark Parsons, another Springfield police officer with 27 years experience, described his duties in part as "fingerprint examiner and also the senior AFIS operator." He stated that he has "been through the basic police academy and crime scene schools, fingerprint training classes with the FBI, and other training throughout the years with our professional organizations, International Association of Identification and others." Parsons testified that he is trained to use the "ACEV method" of fingerprinting, an acronym in which "A" stands for analyze; "C" stands for compare; "E" stands for evaluate; and "V is the verifier, where we have another examiner verify our work." According to Parsons, "'AFIS' is another acronym. It stands for Automated Fingerprint Identification System." Parsons testified, AFIS "has a database of fingerprints in it, and it actually compares patterns of fingerprints. It gives us scores and helps us identify known prints." The database is limited to known prints on file in Springfield and Clark County. The trial court recognized Parsons as an expert on fingerprint analysis.

{¶ 14} Parsons testified that he analyzed the prints obtained by Klark from the crime scene. According to Parsons, he determined that two out of the six cards that Klark submitted contained sufficient partial prints, and he scanned them into the AFIS system. Parsons testified he "got reasonably high scores on both of those searches and then proceeded to the next step of comparing the list of candidates that was produced from the search." Kelley was identified as a candidate, and Parsons retrieved his ten-print fingerprint card on file and did "a direct comparison of the actual latent tape lift to the prints on the card." Parsons determined that the fingerprints at the scene came from the same person whose fingerprints were on the ten-print card identified as Kelley's. Parsons

relayed his finding to Detective Jacobs.

**{¶ 15}** Parsons further testified that Kelley provided another set of fingerprints on September 29, 2010. Parsons stated that he also compared those prints to the prints lifted from the scene herein, and he stated that they were a match. Parsons concluded, based "on my opinion and the name on this card, that Tyrone Kelley is the one that left the prints at the scene." Parsons further testified that the prints belong to Kelley and no other person.

**{¶ 16}** On cross-examination, Parsons indicated that he examined all six sets of prints "to see if they have value enough for the AFIS system to actually conduct a search." According to Parsons, he only submitted two of the six cards to the AFIS system because the other four cards, based upon his experience, did not exhibit enough "ridge detail" for the AFIS system to identify the prints. Parsons stated that the AFIS system identified multiple candidates from the cards he submitted. Out of those candidates, Parsons only compared Kelley's prints on file to the prints from the scene, because when "we start our comparison, we obviously start with the highest score and work our way down."

**{¶ 17}** On redirect examination, Parsons was asked if his work was reviewed by a witness for the defense, and counsel for Kelley objected. A lengthy bench conference followed, in the absence of the jury, in which counsel for Kelley argued that any testimony by Parsons regarding what he was told by Bivens would be hearsay. The following exchange occurred:

> MR. CAREY: * * * The defendant asked for funds to retain an expert. I didn't know who this expert was, but he presented himself to the police station on behalf of Mr. Marshall.
>
> * * *

The fact that he did this analysis is relevant. The defense did have an expert. They did have a witness who reviewed this.

I don't need to ask what was told or any hearsay questions, but it's important for the jury to know while Mr. Marshall is essentially trying to discredit the work done by Officer Parsons, that there was someone for the defense who reviewed this work. That's what's relevant. And it doesn't contain hearsay.

MR. MARSHALL: Of course it does. The only way this is going to get before the jury who the person was is if the person came in and told Officer Parsons who he was, and that he was there and what his purpose for being there was. * * *

{¶ 18} When trial resumed, the following exchange occurred:

MR. CAREY: * * * after considering this matter over the evening, the State would propose to rephrase the last question that was asked of the witness, Officer Mark Parsons, and change that to: 'Did you allow * * * - - any other persons to review your work?'

And then to ask who reviewed his work. There would be no hearsay involved. There would only be the facts that he's aware of.

THE COURT: Any objection to that?

MR. MARSHALL: Yes, Judge. First of all, it does involve hearsay because the only way Officer Parsons would know who reviewed the work is if that person told him who he was. * * *

* * *

* * * And more importantly, I guess, it's not relevant. And relevancy goes

to two things; the probative value, does it tend to prove a fact in issue; and the prejudicial effect.

This may have a prejudicial effect because the only - - * * * reasonable inference the jury is going to be able to make is that as a result of all this, is that a defense expert reviewed the work; we didn't call him to testify. So he must have came to the conclusion that Officer Parsons' work was done correctly, and he got the same results that Officer Parsons got.

Obviously, that would be highly prejudicial to my client, but it doesn't prove anything. * * *

Now, I said they are going to make an inference * * * but there is no probative value to the evidence if they are not asking what the results of the test were. And they don't have that information * * * .

MR. CAREY: * * * the defense, I believe, opened the door for this by questioning Mark Parsons' analysis. The fact that this was based upon his opinion as to which prints and on the list of hits that should be reviewed, I believe that that is great probative value for the jury just the fact that his work was reviewed not by one person, but by two. One of them was an independent certified latent print examiner.

And there would be no reference to the defendant. Just the fact that his work was reviewed first by a supervisor, Jeff Steinmetz, and second, by an independent certified latent print examiner. This does have probative value to the jury * * .

MR. MARSHALL: Well, that's the first that that's come to light now, that we're going to have him testify that his work was reviewed by Jeff Steinmetz. * * * That should come from Steinmetz, not from Mark Parsons [for purposes of cross-examination].

* * *

What did you say with regard to Bivens? Oh, he said he's going to ask Parsons to testify that it was a certified latent print examiner. Well, the only way Parsons would know that is if he asked Bivens. And again, we get into the hearsay issue.

* * *

THE COURT: I'm going to allow the State to ask Officer Parsons if his work was reviewed by Officer Steinmetz and an independent certified latent print examiner, but he won't be able to testify as to what, if any findings, they may have had.

If either party wants the findings of Paul Bivens or Officer Steinmetz to be presented to the jury, they would have to call those individuals to testify.

* * *

MR. MARSHALL: Judge, * * * . One, with regard to the certified latent print examiner issue, I would just reinstate my objections for the reasons I stated before.

With regard to Officer Steinmetz, of course, today is the first day I've learned of him as a potential witness. I would object to him being - - That being

commented on at all, because it's my client's constitutional right to cross-examine witnesses, since Officer Steinmetz is not being called as a witness.

\* \* \*

MR. CAREY: He's not going to be testifying, but his name does appear on Officer Parsons' report as having reviewed it.

THE COURT: So I don't believe that's an issue of confrontation. If the defense wants to call Officer Steinmetz, they can. It's just Officer Parsons indicating that his work was reviewed by Officer Steinmetz. He's not being permitted to testify as to what, if any, finding Officer Steinmetz made.

{¶ 19} When the jurors returned to the courtroom, the following exchange occurred after Parsons was recalled to the stand:

BY MR. CAREY:

Q. Officer Parsons, I believe you're still under oath from yesterday, and I'm going to continue with the questions that I was asking you on my rebuttal.

Did you allow any other persons to review your work in this case.

A. Yes, I did.

Q. Who reviewed your work?

A. Officer Steinmetz did first as the verification part of the AFIS method, and Paul Bivens also reviewed my work.

Q. Okay, and who is Paul Bivens?

MR. MARSHALL: I object, Judge.

THE COURT: Overruled.

THE WITNESS: Private consultant, a certified latent print examiner.

The record reflects that there was no further questioning regarding the review of Parsons' work on re-direct examination.

{¶ 20} On re-cross examination, the following exchange occurred:

Q. * * * Now, Officer Steinmetz, he's in your office also?

A. Yes, sir.

Q. * * * Another fingerprint examiner might look at it and have a different opinion, right? Is that possible?

A. Possibly, if I made a mistake on it.

Q. * * * You said that Officer Steinmetz reviewed you're

(sic) AFIS work, right?

A. No. He reviewed my final results of my identification.

Q. * * * I thought you said he reviewed your AFIS work. He did not review your AFIS work?

A. No. He actually does a blind verification. Once I come up with my identification, he's presented with my folder, and he's given the latent tape lift and then the card of the suspect. He does not know which finger I matched it to or found that it matches.

He just works off of that and comes up with, hopefully, comes up with the same conclusion that I do. And that's what he did.

* * *

Q. * * * Now, so he didn't go back and look at this AFIS information that

you had printed out then.   Is that what you're saying?

A.   No.   That really has no bearing on it.

Q.   And Mr. Bivens wasn't given this AFIS information either, correct?

A.   Once again, it has no bearing on the identification.

Q. * * * So if Mr. Bivens wasn't given the AFIS information and Officer Steinmetz was not given the AFIS information, then neither of them would have known of the * * * other potential suspects, correct?

A.   There's always other suspects.

{¶ 21} Next, Mary Harris, a police service clerk, testified that she fingerprints and photographs people that are processed into the Springfield jail, and she stated that she fingerprinted Kelley on September 29, 2010.

{¶ 22} Detective Robert Jacobs testified that he began investigating the burglary the day after it occurred.   Jacobs stated that the information he received from Rieske regarding the suspect's age, height, weight and build were consistent with Kelley's characteristics.   On cross examination, he indicated that he did not know Kelley's exact height, weight and age.

{¶ 23} The following exchange occurred on redirect examination:

Q.   Detective Jacobs, were you standing in the same spot that Katherine Rieske said that she was standing or sitting when she observed these events across the street?

A.   Yes, I was.

Q.   And from that perspective, having seen it for yourself, would you have been able to see from there that a suspect was trying to get in through that basement

window?

A.   I would have been able to see somebody.   I mean, my eyes aren't good enough to distinguish who it may have been, but I would have seen that, yes.

Q.   Again, my question is, you would have been able to see that there is actually someone going in through that window from that perspective?

A.   Yes, I think so.

{¶ 24}   Defense counsel's objection was overruled.   The following exchange occurred on recross-examination:

Q. * * * In your line of sight, was there an air-conditioning unit?

A.   You could see at the time that there was something toward the front of it. But from her angle, you could see beyond it.

Q.   Did you hear Ms. Rieske talk about the air-conditioning unit?

* * *

A.   Yes.

Q.   Did you hear Ms. Rieske say that the individual went down behind the air-conditioning unit?

A.   Yes.

Q.   Did you hear Ms. Rieske say that she assumed someone was trying to see if they could fit through the window?

A.   I'm not sure of those exact words, but yes, I do remember her talking about it.

{¶ 25} Hansel Kirkland testified that he was not at home at 9:45 on the morning of the

incident. He testified, that he and his wife "left about ten minutes of 10 to go to church," for a 10:00 service, and that he normally leaves at that time for church. Hansel testified that the couple returned around noon, and someone had left a note on their door "that somebody tried to break in the basement winder (sic)." Upon inspecting the window, Hansel testified that it was "all messed up," in that the screen had been removed, and the "[w]inder (sic) was out off the form where, you know, where it's build in." (Sic). Hansel stated that he fixed the window himself. Hansel stated that he believed the window was unlocked, and he stated that the window opens "[f]rom the inside." According to Hansel, it's "got two handles on it and you pull it in." Hansel further testified that he did not know Kelley.

{¶ 26} On cross-examination, Hansel testified that the window was pushed inward and "knocked out of the socket there." The following exchange also occurred regarding the couple's routine on Sundays:

> Q. * * * You go to church on Sundays?
>
> A. Yes.
>
> Q. Do you go to church every Sunday?
>
> A. Not every Sunday, no.
>
> Q. Just about every Sunday?
>
> A. Just about every Sunday, but I've been missing a few here lately. * * *
>
> Q. Well, that's after this incident occurred. Let's go back to August the 1st. Prior to that date, had you been going to church every Sunday?
>
> A. I go pretty near every Sunday.
>
> Q. And when you go to church, do you always go to the 10:00 service?

A.   Yes.

Q.   And so do you always leave around 9:50 in the morning or thereabouts?

A.   Well, maybe a few minutes later or earlier.

Q.   And do you always come back around noon that day?

A.   Yes, unless we'd go out to eat.

Hansel further testified that his wife accompanies him to church every Sunday as set forth above, and that no one else resides in the home.

{¶ 27}   Joan Kirkland testified that at 9:45 a.m. on the date of the incident, she and Hansel were on their way to church, and that they normally go to church at that time.   She stated that when they returned from church that day, they found a note on their back door stating that the police had been there, and that someone had tried to break into their basement window.   When she later inspected the window, after Hansel had done so, she stated that it was damaged in that "it was kind of like sprung and the screen was out of it."   Joan testified that the window was pushed inside the house.

{¶ 28} Joan testified that she does not know Kelley.   When asked if she had ever looked at her house from the perspective of Rieske's porch, the following exchange occurred:

A.   I used to know the people that used to live there; and I've been over on

that porch before, and I can look directly right across the street to our house.

Q.   And you have taken that view from the porch?

A.   Yes, I have.

Q.   And from that porch, can you see your basement window on the left side

of your house?

A. I would say yes, yeah.

{¶ 29} On cross-examination, the following exchange occurred regarding the couple's Sunday routine:

Q. You and Mr. Kirkland go to church on a regular basis?

A. Yes, we do.

Q. So had you been going to church every Sunday prior to August the 1st, 2010?

A. Yes, we did, pretty much so.

Q. As best you can remember, you had gone every Sunday?

A. Yes.

Q. And had been going every Sunday for several months, would that be a fair statement?

A. Yes.

Q. And would you always leave the home around 9:45 in the morning?

A. Approximately, yes.

Q. And on this particular day, you returned around noon; is that correct?

A. That's correct.

Q. * * * And would that be about the time you returned home every time from church?

A. Unless we would go out to eat, which we didn't always do that, but we would return home about that time, around 12:00.

{¶ 30} Joan's cross-examination continued as follows regarding the window:

Q. You made some reference to the window at the house, the basement window, that you had it open?

A. We had it open.   It goes back on the inside of the house.

* * *

A.   We opened it in the summer.

* * *

Q.   Was the window open when you left for church?

A.   Yes, it was.

Q.   Do you know whether or not that window had been damaged at some prior time?

A.   Not before this incident took effect, no.   It was practically a new window.   It hadn't been in too many years.

{¶ 31}   After the State's exhibits were admitted, Kelley moved for acquittal, arguing that the state filed to prove that he trespassed into the Kirklands' home, and that the State failed to prove that someone was present or likely to be present at the Kirklands' home at the time of the offense. The trial court overruled the motion, noting that the situation is similar to that in *State v. Kilby*, 50 Ohio St.2d 21, 361 N.E.2d 1336 (1977).   The court reasoned as follows:

* * * There is the issue that the victims routinely went to church.   I think that makes the argument a little stronger for the defense that perhaps the victims weren't likely to be present.   But given the time that the victims said they leave and the time of the alleged burglary, it seems to the court that the State has met its burden with respect to a Rule 29 motion, so I think that should go to the jury.

**{¶ 32}** The court further noted, regarding whether or not Kelley trespassed within the Kirklands' home, that Rieske testified that Kelley "stuck his body down in," and the court concluded, "that's sufficient for a jury to possibly find that he did break the plane. Whether he broke the plane or not, the Court is going to give an instruction to the jury on an attempted burglary."

**{¶ 33}** Kelley called Yumashita Murry to establish his alibi. She testified that Kelley is the father her child, and that he was at her home at 9:45 August 1, 2010 "because that weekend I was sick, and he had to come over and take care of my daughter." According to Murry, she suffers from diabetes, and "about that time, it took a toll on me to where it put me down." Murry stated that Kelley came to her home on the Friday before the incident around noon, and he stayed there all weekend, including all day Sunday. When asked how she remembered that she was ill on that particular weekend, Murry stated that she was to begin classes on Monday, August 2, 2010, in a jobs program called the Teams Program, and that the date of her first class served as a reference point in her memory. Murry denied speaking with Detective Jacobs regarding Kelley's alibi.

**{¶ 34}** In closing argument, Kelley argued in part as follows regarding the fingerprint identification:

> Now, here's my concern about you relying on this fingerprint identification. The officer said that - - first of all, he said it's been reviewed by two different people. Well, fine. What he didn't do, he didn't give the reviewers pertinent information.
>
> He didn't give them the AFIS printouts, and more importantly he didn't give them the other suspects that came out of the AFIS system.
>
> * * *

That should be a concern to you when you are saying okay how much are we willing to rely on this fingerprint. * * *

**{¶ 35}** Kelley asserts two assignments of error. His first assignment of error is as follows:

"APPELLANT'S CONVICTION OF THE CHARGE OF BURGLARY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AGAINST THE SUFFICIENCY OF THE EVIDENCE."

**{¶ 36}** According to Kelley, there was no evidence that the Kirklands were "present or likely to be present" at the time of the offense; the evidence that Kelley trespassed into the Kirklands' home "at most could only support the lesser included charge of attempted burglary"; and Kelley's identity was not established since Rieske did not identify him in the photo spread despite the "prominent bulge" on his face, and since additional suspects were identified by AFIS but not investigated, and finally due to Kelley's alibi.

**{¶ 37}** As this Court has previously stated:

When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *State v. Dossett*, 2d Dist. Montgomery

No. 20997, 2006-Ohio-3367, 2006 WL 1793245, ¶ 32.

**{¶ 38}** The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1997).

> Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

**{¶ 39}** Further, the Supreme Court has noted:

> In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; see, also, *State v. Thompkins* (1997), 78

Ohio St.3d 380, 386, 678 N.E.2d 541. *State v. McKnight*, 107 Ohio St.3d 101, 112, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 70.

### 1. Likely to be Present

**{¶ 40}** The version of R.C. 2911.12 in effect at the time of the offense provided in relevant part: "(A) No person, by force, stealth, or deception, shall do any of the following: * * * (4) Trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present."

**{¶ 41}** Kelley directs our attention to *State v. Frock*, 2d Dist. Clark No. 2004 CA 76, 2006-Ohio-1254, 2006 WL 677715. Therein we discussed whether a person is "likely" to be present as follows:

> "Although the term 'likely' connotes something more than a mere possibility, it also connotes something less than a probability or reasonable certainty. A person is likely to be present when a consideration of all the circumstances would seem to justify a logical expectation that a person could be present." *State v. Green* (1984), 18 Ohio App.3d 69, 72, 480 N.E.2d 1128. In determining whether persons were present or likely to be present * * * "the defendant's knowledge concerning habitation is not material. The issue is not whether the burglar subjectively believed that persons were likely to be there, but whether it was objectively likely." *State v. Brown* (Apr. 28, 2000), Hamilton App. No. C-980907. Merely showing that people dwelled in the residence is insufficient; the state must adduce specific evidence that the people were present or likely to be present at the time of the burglary. *State v. Fowler* (1983), 4 Ohio St.3d

16, 18, 445 N.E.2d 1119.

The Supreme Court has held that the "likely to be present" element is satisfied where the structure is a permanent dwelling house which is regularly inhabited, the occupants were in and out of the house on the day in question, and the occupants were temporarily absent when the burglary occurred. *State v. Kilby* (1977), 50 Ohio St.2d 21, 23, 361 N.E.2d 1336. See, also, *Fowler*, 4 Ohio St.3d at 19, 445 N.E.2d 1119; *State v. Baker*, Butler App. No. CA2003-01-16, 2003-Ohio-5986. On the other hand, courts have found insufficient evidence that the occupants were likely to be present when they were absent for an extended period, such as a vacation, and no one else was regularly checking on the house. (Citations omitted). Similarly, if the occupants of a house are gone for the entire work day, they are not "likely to be present" during the day. (Citation omitted). *Frock*, ¶ 20-21.

{¶ 42} In *Frock*, the victim testified that on the date of the burglary, she went to work at 7:15 a.m. and returned at 2:00 p.m., when she discovered the break-in. She testified, "[e]very day I go [home] around that time to let my dog out to go to the bathroom." Id., ¶ 22. A mail carrier testified that she observed the burglars leaving the residence between 1:00 and 1:30. Id. This Court determined:

The evidence suggests that the burglary occurred between 1:00 and 1:30, and [the victim] testified that she routinely returned home "around 2" to let her dog out. As such, the evidence does not support the conclusion that someone was likely to be home between 1:00 and 1:30. The evidence, instead, demonstrated that no one was

likely to be present in the house between the hours of 1:00 and 1:30 p.m. * * * Id., ¶ 23.

**{¶ 43}** Herein, Rieske testified that she was smoking a cigarette on her porch at about 9:45 a.m. when she observed Kelley in the Kirklands' yard. Hansel testified both that he and his wife were not home at 9:45, and that they "left about ten minutes of 10" for church. On cross-examination, he stated that he and his wife always leave for church "maybe a few minutes later or earlier" than 9:50 a.m. Joan testified that she and Hansel were on their way to church on the date of the offense at 9:45, and on cross-examination she stated that they normally go to church at "approximately" that time.

**{¶ 44}** We conclude that consideration of all of the circumstances justifies a logical expectation that the Kirklands could have been present at 9:45 a.m., the estimated time of the burglary. The burglary occurred within the approximate time period in which they typically departed for church. In other words, pursuant to their usual Sunday schedule, the Kirklands could have logically been home until ten minutes before ten or a few minutes later, and there was accordingly more than a mere possibility of their presence at home at approximately 9:45 a.m. Furthermore, the Kirklands testified that their attendance at church was not perfect. Having considered all of the evidence and the reasonable inferences, we cannot conclude that the jury lost its way in determining that the Kirklands were likely to be present at the time of the offense. We further conclude that sufficient evidence supports the finding that the Kirklands were likely to be present when the offense occurred.

### 2. Trespass

**{¶ 45}** R.C. 2911.21 defines trespass as follows: "(A) No person, without privilege to do

so, shall * * * (1) Knowingly enter or remain on the land or premises of another."

{¶ 46} Rieske testified that Kelley, after he removed the screen to the window, "stuck his body down in." Klark and Jacobs testified that from Rieske's perspective on her porch, she could see beyond the air conditioner to the basement window. Klark testified that the window was "pushed in." Hansel testified that the window itself was damaged in that it was "knocked out of the socket there," and that he fixed it. Joan stated that the window was "kind of like sprung."

{¶ 47} Having considered all of the evidence, we cannot conclude that it weighs against Kelley's conviction, or that his conviction is not supported by sufficient evidence. Construing the evidence most strongly in favor of the prosecution, it inferentially establishes that Kelley broke the plane of the structure of the Kirklands' home and accordingly trespassed therein. In other words, the trespass element of burglary was adequately established. Finally, we note that Kelley's reliance upon two cases from the Ninth District is misplaced. In *State v. Anderson,* 9th Dist. Summit No. 10533, 1982 WL 5085 (July 7, 1982), the "would be intruder was unable to gain entrance" and was accordingly convicted of attempted burglary. In *State v. Sams*, 9th Dist. Summit No. 20063, 2000 WL 1729475 (Nov. 22, 2000), Sams' accomplice "attempted to pry the door off its track," and "succeeded in opening the door a few inches," before fleeing, and his conviction for attempted burglary was affirmed. Here, a screen was removed, the interior window frame was damaged according to the residents, and the perpetrator's tall frame disappeared from sight, supporting a conclusion that the structure's plane was broken. Significantly, the factfinder herein, a jury of 12, rejected a finding on attempted burglary.

### 3. Identity

{¶ 48} Regarding Rieske's failure to identify Kelley in the photo spread, we note most

importantly that Kelley's fingerprints were obtained at the scene. Further, Jacobs testified that the information he received from Rieske regarding Kelley's age, height, weight and build were consistent with Kelley's characteristics. While Kelley apparently had "a pretty prominent bulge on the left side of his face" at trial, there is nothing to suggest that the bulge was present when he committed the offense, and it is not visible in his photo.

{¶ 49} While multiple candidates were identified by the AFIS system, Parsons testified that the system always provides multiple candidates. Parsons, with 27 years of experience, testified that he only performed a direct comparison of Kelley's prints to those obtained at the scene because Kelley's prints had the "highest score." That comparison led Parsons to conclude that the prints from the scene belonged to Kelley to the exclusion of anyone else. The prints from the scene also matched the set of prints provided by Kelly in September, 2010.

{¶ 50} Regarding Kelley's alleged alibi, the jury, as it was free to do, clearly found Murry's testimony not credible, and we defer to the fact finder's assessment of credibility.

{¶ 51} Having considered the evidence and all reasonable inferences, we cannot conclude that the jury created a manifest miscarriage of justice such that a new trial is warranted. Further, construing the evidence most strongly in favor of the State, we conclude that Kelley's identity was established beyond a reasonable doubt.

{¶ 52} Since Kelley's conviction for burglary, for the reasons set forth above, is not against the manifest weight of the evidence, and since his conviction is supported by sufficient evidence, Kelley's first assigned error is overruled.

{¶ 53} Kelley's second assigned error is as follows:

"APPELLANT WAS PREJUDICED BY INTRODUCTION OF INADMISSIBLE

HEARSAY TESTIMONY."

{¶ 54} According to Kelley, "merely allowing Officer Parsons to testify that his results (which matched the fingerprints found on the screen window to Mr. Kelley) were 'verified' by Officer Steinmetz unfairly prejudice[s] the Defendant, because even without Officer Steinmetz['s] actual testimony such a reference would improperly bolster Officer Parsons' credibility by overly (sic) suggesting that Officer Parsons' results were correct. Further, the use of the word 'verify' suggests Officer Steinmetz's review of Officer Parsons' work was accurate." Kelley asserts that Parsons' reference to Steinmetz's verification of Parsons' work introduced inadmissible hearsay such that his "right to confront Officer Steinmetz was violated."

{¶ 55} The State responds that Kelley did not object to Parsons' characterization of Steinmetz's review of his work as a "verification," and that he has accordingly waived all but plain error. The State further asserts that Kelley "explored in greater detail what exactly the review completed by Officer Steinmetz consisted of" on cross-examination, and that he accordingly invited any error that resulted. Further, the State notes that Kelley argued in closing that the jury should discredit the review "because the reviewers did not have enough information." Finally, the State asserts that if inadmissible hearsay were admitted, the error is harmless.

{¶ 56} Hearsay is "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). An out of court statement may consist of an oral or written assertion or nonverbal conduct. Evid.R. 801(A). "Hearsay is not admissible" except as provided by the U.S. or Ohio Constitutions, by statute or court rule. Evid.R. 802.

{¶ 57} "Defense counsel's failure to object waives all but plain error. (Internal citation

omitted).   Counsel's failure to   object 'constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly could have been otherwise.'" *State v. Boykin*, 2d Dist. Montgomery No. 19896, 2004-Ohio-1701, 2004 WL 690799, ¶ 18.

{¶ 58}   The Sixth Amendment's Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."   "The United States Supreme Court has held that the right to confrontation is violated when an out-of-court statement that is testimonial in nature is admitted into evidence without the defendants having had the opportunity to cross-examine the declarant. *Crawford v. Washington* (2004) 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177."   *State v. Syx*, 190 Ohio App.3d 845, 2010-Ohio-5880, 944 N.E.2d 722, ¶ 23.   The *Crawford* Court stated that "the core class of testimonial statements includes statements 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'   Id. at 52."   *Syx*, id.
"Despite the importance of this right, a violation of the Confrontation Clause can be harmless if 'it is clear beyond reasonable doubt that the admission of these hearsay statements did not prejudice' the defendant. (Citation omitted)."   *Matter of Umoh*, 2d Dist. Montgomery No. 16912, 1998 WL 737983 (Oct. 23, 1998).   The factors to be considered in determining if error is harmless include "'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' (Citation omitted)."   Id.

{¶ 59} The trial court ruled that Parsons could testify only to the fact that his work was

reviewed, and by whom, and that he could not testify as to the results of those reviews. Parsons testified that Steinmetz reviewed his work "as the verification part of the AFIS method," and Kelley, as the State asserts, did not object to that testimony. The trial court should have excluded the testimony regarding review/verification by two additional experts, Steinmetz as well as Bivens, who was retained by Kelley. The testimony clearly implied Parsons' results were verified by the experts, and the Confrontation Clause was implicated. Unfortunately, defense counsel exacerbated this error by eliciting on cross the fact that Steinmetz reached the same conclusion as Parsons. Nevertheless, any error is harmless beyond a reasonable doubt when the overall strength of the State's case is considered. Parsons, an expert with 27 years of experience described in detail the process he used to identify Kelley's fingerprints, and not only did he match the prints from the scene to the card on file containing Kelley's prints, he also independently matched the prints from the scene to the set of prints Kelley provided in September, 2010. Kelley's physical characteristics were consistent with Rieske's description of the suspect she observed. The only evidence contradicting the State's evidence was Murry's testimony, which the jury did not credit.

{¶ 60} There being no merit to Kelley's second assigned error, it is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and HALL, J ., concur.

Copies mailed to:

Lisa M. Fannin
Adam James Stout
Hon. Douglas M. Rastatter