[Cite as *State v. Eicholtz*, 2013-Ohio-302.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK   COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2012-CA-7 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 11-CR-494 |
| v. | : | |
| | : | |
| JONATHAN EICHOLTZ | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on the 1st day of February, 2013.

· · · · · · · · · · ·

LISA M. FANNIN, Atty. Reg. #0082337, Clark County Prosecutor's Office, 50 East Columbia Street, 4th Floor, Post Office Box 1608, Springfield, Ohio 45501
        Attorney for Plaintiff-Appellee

JEREMY M. TOMB, Atty. Reg. 30079664, Klein, Tomb & Eberly, LLP, 124 West Main Street, Troy, Ohio 45373
        Attorney for Defendant-Appellant

· · · · · · · · · · · · ·

HALL, J.

{¶ 1}    Jonathan Eicholtz appeals from his conviction and sentence on charges of

aggravated burglary, abduction, and domestic violence.

{¶ 2}   Eicholtz advances seven assignments of error on appeal. First, he contends juror misconduct deprived him of his right to a fair trial. Second, he challenges the legal sufficiency and manifest weight of the evidence to support his aggravated burglary conviction. Third, he claims the trial court erred in allowing inadmissible hearsay testimony and violating his Sixth Amendment confrontation right. Fourth, he argues that the trial court erred in allowing the State to impeach its own witness. Fifth, he asserts that prosecutorial misconduct deprived him of a fair trial. Sixth, he maintains that the trial court abused its discretion in imposing maximum and consecutive sentences. Seventh, he raises a claim of cumulative error.

{¶ 3}   The present appeal stems from events that began on May 12, 2011. At that time, Eicholtz shared an apartment with his girlfriend, Tabitha Jackson, who worked at a local grocery store. On the evening of May 12, 2011, Jackson had drinks at Legends bar in Enon with two co-workers, Mike Billinghurst and Kathy Bendall, who is Eicholtz's aunt. The drinking continued from roughly 6:30 p.m. until 2:00 a.m. Eicholtz arrived at the bar sometime that evening and accused Billinghurst of having a sexual affair with Jackson. Eicholtz angrily left the bar alone after trying to start a fight. When the bar closed, Billinghurst, Bendall, and, possibly, Jackson all went to Bendall's home to sleep.[1]

{¶ 4}   At trial, the State's evidence established that Eicholtz later entered Bendall's home looking for Billinghurst and Jackson. The State presented evidence that the doors of the home were locked and that Eicholtz entered through a dining-room window. Once inside, he woke up Bendall's step-daughter, Alisha, in her bedroom and asked if Jackson was there.

---

[1] At trial, conflicting evidence was presented as to whether Jackson went to Bendall's house or went directly back to the apartment she shared with Eicholtz. For purposes of the issues before us, this dispute is not particularly important.

Bendall apparently heard the noise and confronted Eicholtz, expressing surprise about his presence in the home and ordering him to leave. Bendall's husband, Brad, also questioned what Eicholtz was doing in the home and ordered him out. The State's evidence established that Eicholtz responded by proceeding into a bedroom where he found Billinghurst asleep. Eicholtz began stomping on and punching Billinghurst. Alisha called the police. Eicholtz left before they arrived.

{¶ 5}   Tabitha Jackson appears to have left Bendall's home around sunrise and returned to the apartment she shared with Eicholtz. Jackson subsequently failed to appear for work and did not answer calls to her cell phone. Kathy Bendall's brother, Tom Eicholtz, drove to the apartment to check on Jackson's welfare. Upon arriving, he knocked on the apartment door. He then heard Jackson screaming and saw her outside wearing a bra and underwear. She told him that Eicholtz had beaten her. He drove her to a nearby fire department, where she reported that Eicholtz had been beating her for hours. According to the State's evidence, Jackson reported that Eicholtz had restrained her against her will, hitting, kicking, and choking her, and knocking her unconscious multiple times. Jackson explained that she escaped by jumping out a window when she heard Tom Eicholtz knocking on the front door. The State's evidence established that Jackson had bruises all over her body. She also complained of head and neck pain.

{¶ 6}   At trial, Jackson's story changed. She insisted that Eicholtz had not hurt her. She professed to have sustained her injuries in a fight with another woman outside Legends bar. Kathy Bendall testified, however, that she was with Jackson the entire evening at the bar. To Bendall's knowledge, Jackson never went outside the bar without her and never had a fight

there. In any event, Jackson claimed that she returned to her apartment after the fight and accused Eicholtz of sleeping with this other woman. She told the jury she lied about Eicholtz beating her to get even with him for his infidelity. Eicholtz testified in his own defense and also denied beating Jackson. He corroborated Jackson's claim that she angrily returned to the apartment and accused him of cheating on her. He also testified that she told him she had been hurt in a bar fight. As for his presence at Legends bar, Eicholtz admitted seeing Jackson and Billinghurst there together and confronting Billinghurst. Eicholtz claimed he left the bar and went to his apartment until around 3:30 a.m. At that time, he drove to Bendall's house looking for Jackson, who had not yet returned to the apartment. He testified that he expected to find Jackson there with Billinghurst.

{¶ 7} Eicholtz maintained at trial that he had entered Bendall's house multiple times on the night in question. First, he entered through an unlocked front door. He proceeded to Alisha's bedroom, woke her up, and asked if Jackson was there. Alisha denied Jackson being there, and Eicholtz left the house. According to Eicholtz, he sat in his truck thinking for a few minutes. He then returned to Bendall's house and found the front door locked. He proceeded to the back door, which he remembered Kathy Bendall's husband, Brad, having said he would leave unlocked in case Eicholtz wanted to come over.[2] Eicholtz testified that he went inside to check a bedroom where he suspected he would find Jackson and Billinghurst together. Before doing so, however, he went to the dining room and opened a window so he could calm his nerves by smoking a cigarette without getting smoke in the house. To do so, he knocked

---

[2]Alisha Bendall testified at trial that her father, Brad, did not particularly like Eicholtz, that the two men were not friends, and that Brad Bendall never had invited Eicholtz "to stay over at the house[.]" (Tr. Vol. I at 225).

out the screen. After he finished the cigarette, Kathy Bendall confronted him. She yelled at him and denied Jackson's presence in the house. She also made him go outside. Eicholtz testified that after he went to the front yard, Bendall invited him back in to search for Jackson. He accepted the invitation and checked a bedroom where he found Billinghurst on the floor by himself. Eicholtz told the jury that he engaged in a shouting match with Billinghurst before leaving the house when Bendall ordered him out again. Eicholtz denied hitting or kicking Billinghurst.

**{¶ 8}** Eicholtz claimed he went back to his apartment and waited for Jackson, who arrived around 8:00 a.m. or 9:00 a.m. He admitted arguing with Jackson but denied physically harming her. He claimed Jackson threatened to make false charges against him before jumping out the window in her bra and underwear when his father, Tom Eicholtz, arrived and began knocking on the door.

**{¶ 9}** After Jackson made her allegations against Eicholtz, he fled to New Mexico. Jackson ignored a grand jury subpoena and joined him there. Days after Jackson's arrival, Eicholtz was arrested and returned to Ohio. Jackson also returned to Ohio and began recanting her allegations. Despite Eicholtz's denials and Jackson's recantations, the jury found him guilty of aggravated burglary, abduction, and domestic violence. The trial court imposed an aggregate ten-year prison sentence. This appeal followed.

**{¶ 10}** In his first assignment of error, Eicholtz contends juror misconduct deprived him of his right to a fair trial. This argument concerns juror number three, who Eicholtz claims had her eyes closed through most of the second day of his three-day trial. Although Eicholtz claims the juror's actions entitled him to a mistrial or a new trial, he did not request either

remedy below. Therefore, he acknowledges that we are limited to plain-error review. *State v. Sanders*, 92 Ohio St.3d 245, 249, 2001-Ohio-189, 750 N.E.2d 90. It is well settled that plain error does not exist unless an error is obvious and, but for the error, the outcome at trial "clearly would have been otherwise." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108.

{¶ 11}  We see no plain error here. On the morning of the third day of trial, defense counsel advised the trial court that Eicholtz had reported seeing juror number three appear to be sleeping. The trial court responded:

> * * * I did notice that Juror #3 had her eyes shut a couple of times yesterday afternoon, and I tried to keep an eye on that.
>
> My bailiff indicated that the juror told her, my bailiff, that she has some kind of a condition in that, I don't know what it is; but that sometimes she puts her head down and closes her eyes, but she is not sleeping. I don't know if that's the case, but I will keep an eye on her.

(Tr. Vol. III at 568).

{¶ 12}  The record contains no other information about the incident. Notably absent is any evidence to support Eicholtz's claim that juror number three slept through "large amounts of critical testimony." As noted above, the record reflects only that the juror shut her eyes a couple of times and denied being asleep. On the record before us, we find no plain error in the trial court's failure to grant a mistrial or a new trial. The first assignment of error is overruled.

{¶ 13}  In his second assignment of error, Eicholtz challenges the legal sufficiency and manifest weight of the evidence to support his aggravated burglary conviction. He makes

three arguments in support. First, he contends the elements of aggravated burglary were not proven beyond a reasonable doubt. Second, he claims the criminal offense supporting the aggravated burglary charge was not identified. Third, he asserts that "there were no jury instructions to aid the jurors from losing their way in determining whether requisite elements were met."

{¶ 14} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 15} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. A judgment should be reversed as being against the manifest

weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983)

{¶ 16}   With the foregoing standards in mind, we conclude that Eicholtz's aggravated burglary conviction is supported by legally sufficient evidence and is not against the weight of the evidence. Contrary to Eicholtz's first argument, the State proved the elements of aggravated burglary beyond a reasonable doubt.   Eicholtz was indicted under R.C. 2911.11(A)(1), which provides: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1) [t]he offender inflicts, or attempts or threatens to inflict physical harm on another." On appeal, Eicholtz concedes that the purpose to commit a criminal offense may be formed during a trespass in an occupied structure. *State v. Demoss*, 2d Dist. Champaign No. 2001-CA-5, 2002-Ohio-1193, 2002 WL 360581, *11 (March 8, 2002).

{¶ 17}   At trial, the State presented evidence that Eicholtz trespassed in Kathy Bendall's home by force, stealth, or deception by entering without permission through the dining-room window. The State's evidence established that several other people were present in the home. The State's evidence also supported a finding that Eicholtz entered the home with the purpose of confronting Jackson and Billinghurst, both of whom he expected to find there. The State's evidence established that Eicholtz proceeded to assault Billinghurst inside the home by stomping on him and trying to punch him. Assault is a criminal offense, and Eicholtz inflicted or attempted to inflict physical harm on Billinghurst.

{¶ 18} Eicholtz argued below that he had permission to enter Bendall's home and that he did not assault Billinghurst. The jury was not required to believe these claims, which were contradicted by other evidence. At trial, Kathy Bendall corroborated Eicholtz's claim that she invited him back into the home to look for Jackson after initially ordering him out. (Tr. Vol. I at 205). Bendall also admitted, however, that she did not want her nephew Eicholtz prosecuted for entering her home. (*Id*. at 196). Another witness, Alisha Bendall, testified that she awoke and found Eicholtz in her bedroom. (*Id*. at 211). Alisha got out of bed when Eicholtz told her he was looking for Jackson. (*Id*. at 212). She checked the doors and found them locked. (*Id*.). She saw Kathy Bendall and her father in their bedroom. (*Id*. at 213-214). Alisha then observed the dining-room window and found it open with the screen knocked out. (*Id*. at 215-216). She proceeded to another bedroom where she saw Eicholtz trying to hit Billinghurst. (*Id*. at 217-218). According to Alisha, Kathy Bendall and her father, Brad, tried to break up the fight while Alisha called 911. (*Id*. at 220-221). Billinghurst testified that he heard Kathy and Brad Bendall questioning why Eicholtz was in the house while he was being assaulted. (*Id*. at 255). Alisha rejected the possibility that Eicholtz had entered the house multiple times that night, as he and Kathy Bendall claimed, "unless he climbed back in through the window * * * [b]ecause the front door was still locked." (*Id*. at 235).

{¶ 19} If Alisha Bendall's testimony was believed, the jury reasonably could have found that Eicholtz entered the home through a window without permission and assaulted Billinghurst. Alisha's testimony is materially inconsistent with Kathy Bendall's claim that she invited Eicholtz into the home through the front door to search for Jackson and that no altercation occurred. According to Alisha, Kathy Bendall was in her own bedroom when Eichotz entered the home through the window, with the doors locked, and started the fight. It

is axiomatic that the credibility of witnesses and the weight to be given to the evidence are matters for the jury to resolve. Having reviewed the trial transcript, we conclude that the State presented legally sufficient evidence to support Eicholtz's aggravated burglary conviction. The conviction also was not against the manifest weight of the evidence.

{¶ 20} Eicholtz next asserts that the State failed to identify for the jury the criminal offense that he had the purpose to commit inside Bendall's home. This argument lacks merit. During closing argument, the State maintained that Eicholtz had the purpose to commit assault and domestic violence inside the home. (Tr. Vol. III at 812). Therefore, the criminal offense at issue was identified.

{¶ 21} In his third argument, Eicholtz complains about the lack of a jury instruction identifying the criminal offense he intended to commit. He argues that such an instruction was necessary because the State identified more than one criminal offense in its closing argument. He reasons that the absence of an instruction about the criminal offense he intended to commit created the potential for patchwork verdict. This argument is without merit.

{¶ 22} As an initial matter, Eicholtz has not identified anywhere in the record where he requested a jury instruction on the need for unanimity with regard to the criminal offense he intended to commit. We review for plain error and find none. The Ohio Supreme Court rejected Eicholtz's argument in *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶123. In so doing, it cited *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, the same case Eicholtz cites.[3] The *Fry* court reasoned:

---

[3] In his brief, Eicholtz claims the Ohio Supreme Court stated the following in *Gardner*: "Jury instructions that allow the jury to disagree on the underlying crime in an aggravated-burglary case violate due process." (Appellant's brief at 11). This is a gross mischaracterization. The Ohio Supreme Court actually stated: "In determining whether *jury instructions that allow the jury to disagree on*

Fry asserts that he was denied the right to a unanimous jury verdict on the aggravated-burglary charge because the jury was not instructed on the criminal offense that he intended to commit inside the residence. Consequently, he claims, "the jury charge allows that jury to base its verdict on alternative factual theories rather than upon a single incident * * *." Therefore, "the resultant verdict is not unanimous." The jury instructions on aggravated burglary, which tracked the indictment and the language of R.C. 2911.11(A)(1) and (2), stated: "[Y]ou must find beyond a reasonable doubt that * * * the defendant did, by force, stealth, or deception, trespass in an occupied structure * * * with the purpose to commit in said structure, a criminal offense." (Emphasis added.) Based on these instructions, Fry argues that the jury could return a verdict of guilty on a finding that he had a purpose to commit some criminal offense without reaching a unanimous agreement as to which one.

Fry's argument was rejected in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995. In *Gardner*, the defendant had also been convicted of aggravated burglary. This court held, *"[A] defendant charged with burglary is not deprived of a unanimous verdict simply because the jury was not required to agree unanimously as to the nature of the crime the defendant intended to commit at the time he entered unlawfully into the victim's building. ' "In situations where 'the alternatives of the mens rea*

the underlying crime in an aggravated-burglary case violate due process, a court must be guided by the evidence in the case before it and by general principles of fundamental fairness." (Emphasis added.) *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶70.

[intent] component give rise to the same criminal culpability, it does not appear critical that the jury may have reached different conclusions regarding the nature of the defendant's intent if such differences do not reflect disagreement on the facts pertaining to the defendant's conduct.' " ' " *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶68 * * *.

(Emphasis added.)   *Fry* at ¶122-123; *see also State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, 950 N.E.2d 931, ¶16 (recognizing that the specific crime a defendant intended to commit inside a burglarized home is not an element of aggravated burglary that must be included in the jury instructions); *State v. Marriott*, 189 Ohio App.3d 98, 2010-Ohio-3115, 937 N.E.2d 614, ¶29 (2d Dist.) (noting that jurors need not agree on the intended criminal offense in an aggravated-burglary case).

{¶ 23}   Here the State alleged that Eicholtz had the purpose to commit an assault against Billinghurst and/or Jackson.[4] Having reviewed *Fry* and *Gardner*, we do not believe that the trial court committed plain error by failing to require the jury to agree as to which offense he intended to commit. The second assignment of error is overruled.

{¶ 24}   In his third assignment of error, Eicholtz claims the trial court erred in allowing inadmissible hearsay testimony and violating his Sixth Amendment confrontation right. Specifically, he challenges the trial court's admission of (1) statements by Tom Eicholtz to Kathy Bendall, (2) statements by Tom Eicholtz to Elizabeth Fallon, a family friend, (3) statements by Tom Eicholtz to a paramedic and a deputy, (4) 911 calls by Tom Eicholtz and a neighbor, (5) the 911 call by Alisha Bendall, (6) a nurse's testimony about information in

---

[4]Based on Eicholtz's relationship with Jackson, an assault on her constituted domestic violence.

medical records regarding Tabitha Jackson, and (7) Jackson's statements to Kathy Bendall, EMT workers, a deputy, and Elizabeth Fallon.

{¶ 25} Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible, subject to several exceptions. Evid.R. 802, 803. Several types of statements are excluded from the hearsay rule, including excited utterances, which are "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). Also excluded are present sense impressions, which are "statement[s] describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." We review a trial court's evidentiary rulings for an abuse of discretion, provided an objection is made at trial. *State v. Cunningham*, 2d Dist. Clark No. 11CA 0032, 2012-Ohio-2333, ¶22. Otherwise, we are limited to plain-error review.

{¶ 26} With regard to Eicholtz's confrontation argument, the U.S. Supreme Court has recognized that a defendant's Sixth Amendment right to confront witnesses against him is violated when an out-of-court statement that is testimonial in nature is admitted into evidence without the defendant having had the opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Testimonial statements include statements "'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *State v. Kelley*, 2d Dist. Clark No. 2011 CA 37, 2012-Ohio-1095, ¶58, quoting

*Crawford.* "[S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), syllabus. "Typically, 911 calls made to report an ongoing emergency that requires police assistance to resolve that emergency are not 'testimonial' in nature and therefore the Confrontation Clause does not apply." (Citations omitted.) *State v. McDaniel*, 2d Dist. Montgomery No. 24423, 2011-Ohio-6326, ¶24. "Despite the importance of [the confrontation] right, a violation of the Confrontation Clause can be harmless if 'it is clear beyond reasonable doubt that the admission of these hearsay statements did not prejudice' the defendant." (Citations omitted.) *Kelly* at ¶58.

{¶ 27} With the foregoing standards in mind, we turn to Eicholtz's arguments. He first challenges the trial court's admission of statements by Tom Eicholtz to Kathy Bendall. In particular, he contends the trial court erred in admitting statements Tom Eicholtz made to Bendall on a cell phone from his vehicle immediately after finding Jackson outside in her bra and underwear. The record reflects that he was "frantic" as he described what he had seen upon arriving at Jackon's apartment. The trial court did not abuse its discretion in admitting these statements as excited utterances. Moreover, we find no confrontation problem because Tom Eicholtz's statements to Bendall were not testimonial. Although the appellant also complains about statements Tom Eicholtz made to Bendall conveying things Jackson was

telling him, the trial court instructed the jury to disregard this "double hearsay."

{¶ 28} The appellant next challenges the admission of statements by Tom Eicholtz to Elizabeth Fallon, a family friend. Fallon testified that Tom Eicholtz arrived at her house in a "[v]ery excited, very upset" state and told her that there had been an "incident," that Jonathan Eicholtz had beaten Jackson, and that Jackson was at the Enon Fire Department. Although Tom Eicholtz may have been in an excited state, some of his statements may not have qualified as excited utterances because he did not observe Jonathan Eicholtz beat Jackson. *See State v. Clemmons*, 2d Dist. Montgomery No. 23237, 2010-Ohio-3109, ¶24 (noting that the declarant must personally observe the startling event for an excited utterance). On the other hand, Tom Eicholtz did personally observe Jackson *allege* that Jonathan Eicholtz had beaten her. Jackson's allegation itself was an excited utterance, and if that allegation was a startling event for Tom Eicholtz, then the trial court's ruling may have been correct. Even if we assume error in the trial court's ruling, however, the error was harmless because the record contains substantial other testimony from multiple witnesses about Jackson's allegation that Jonathan Eicholtz had beaten her. Finally, we find no confrontation problem because Tom Eicholtz's statements to Fallon were non-testimonial.

{¶ 29} The appellant next contends the trial court erred in admitting statements Tom Eicholtz made to paramedic Kristi Morrison and deputy Chris Dolin. Morrison testified that she was at the fire station when an SUV pulled up. The trial court sustained an objection when Morrison testified that Tom Eicholtz exited the SUV and stated that "his son had beat[en]" Jackson, a passenger in the SUV. The trial court limited Morrison's testimony to things Tom Eicholtz told her he personally had observed. We see no error in this ruling. Morrison testified

that Tom Eicholtz arrived at the fire station in a "frantic" state. This testimony supports a finding that his statements to her about what he had seen qualified as excited utterances. We also see no confrontation problem because Tom Eicholtz's statements to Morrison were non-testimonial. We reach the same conclusion regarding Tom Eicholtz's statements to deputy Dolin. According to Dolin, he (Dolin) arrived at the fire department and found Tom Eicholtz "ramped up, if you will, kind of in a heightened state of excitement." Tom Eicholtz "was just talking really fast, loud, trying to give [Dolin] information in a short period of time." Dolin then testified about what Tom Eicholtz had reported personally observing when he went to Jackson's apartment to check on her welfare. Dolin's testimony supports a finding that Tom Eicholtz's statements to him were excited utterances. With regard to the confrontation issue, we note that the appellant did not object to Dolin's testimony or raise a confrontation issue. We find no plain error.

{¶ 30} The appellant next complains about the admission of 911 calls by Tom Eicholtz and a neighbor. He asserts that tapes of the calls were improperly admitted as business records and were not authenticated. He also asserts that the neighbor's call included "improper statements" in violation of his confrontation right. The record reflects that 911 call coordinator Michael Combs testified he "takes care of all the 911 information for the county, all the recordings." He explained that he "keeps and maintains" the 911 calls, which are automatically recorded on a computer and later stored by him on CDs. He also testified about how he retrieves 911 calls from the system. According to Combs, he keeps all of the 911 calls in the regular course of business. At trial, he identified the recordings at issue as true and accurate copies of 911 calls received by the Clark County 911 system.

{¶ 31} Upon review, we believe Combs sufficiently authenticated the 911 recordings that were played for the jury. Although we are unpersuaded that the 911 recordings necessarily qualified as business records, [5] Tom Eicholtz's statements were admissible as excited utterances and the neighbor's statements were admissible as present sense impressions. The trial court allowed the jury to hear, as excited utterances, Tom Eicholtz's statements to the 911 operator about what he had observed. The trial court ordered redactions to keep the jury from hearing him tell the 911 operator that Jonathan Eicholtz had beaten Tabitha Jackson. The trial court also allowed the jury to hear, as present sense impressions, the neighbor's statements to the 911 operator about what she had observed immediately before picking up the phone and what she was observing while on the phone. We see no abuse of discretion in these rulings. Although the appellant contends the trial court should have redacted some statements made by the neighbor, he has not identified anywhere in the record where he requested a redaction. The objection at trial, and the ensuing discussion about a redaction, appears to have involved Tom Eicholtz's 911 call. We also see no confrontation problem. The trial court reasonably could have concluded that the 911 calls were non-testimonial. *McDaniel*, 2011-Ohio-6326.

{¶ 32} Finally, even if we assume error in the admission of the 911 calls, the error was harmless beyond a reasonable doubt in light of the other evidence presented. There was no dispute at trial that Jackson fled her apartment crying hysterically in her bra and underwear and claiming to have been beaten by Eicholtz, who followed her. The 911 recordings captured

---

[5]"The theory underlying the business records exception to hearsay set forth in Evid. R. 803(6) is that records kept in the regular course of business are ordinarily accurate with respect to the purposes for which they are kept. Thus, it is reasonable to suppose that [a] 911 taping system accurately recorded [a declarant's] statements. * * * The 911 tape recording system can reasonably be expected to generate an accurate record of what is said by persons calling 911, but it cannot vouch for the accuracy of the statements made by persons calling 911." *State v. Johnson*, 2d Dist. Montgomery No. 15253, 1996 WL 200623, *4 (April 26, 1996).

that sequence of events. The real question for the jury was whether Jackson had fled from an extended beating or whether she had fabricated her allegations against Eicholtz to get even with him. The 911 recordings did little to resolve that question.

{¶ 33} Appellant Eicholtz next challenges the trial court's admission of the 911 call by Alisha Bendall the night he entered her house. Eicholtz contends a recording of the call should have been excluded or at least redacted from the point Kathy Bendall took the phone and began responding to questions from the 911 operator. The record reflects that Alisha Bendall called 911 while Eicholtz was in the house. Kathy Bendall took the phone and told the operator Eicholtz was not supposed to be there. Bendall added that Eicholtz appeared to have entered by breaking in a window. She proceeded to explain why Eicholtz was in her house. When Bendall told the operator she did not want an officer to respond to the scene, the operator asked why. Bendall responded that Eicholtz was her nephew. Although Eicholtz complains that Bendall's statements were hearsay and testimonial, the record reveals no contemporaneous objection when the State requested permission to play the recording. (Tr. Vol. I at 221). In any event, the statements on the recording were largely cumulative of other evidence. Alisha and Kathy Bendall both testified at trial and discussed Eicholtz's presence in the house. We see no reversible error.

{¶ 34} Eicholtz also challenges the trial court's admission of nurse Beth Hurd's testimony about information in medical records regarding Jackson. After reviewing a medical chart, Hurd testified that Jackson arrived at the hospital with multiple injuries from an alleged assault. Hurd added that a doctor's notes showed Jackson reportedly had been hit, kicked, choked, assaulted, and held hostage. Hurd then reviewed the results of various tests that had

been performed on Jackson, the medications she had been given, and the follow-up care that had been recommended.

{¶ 35} The only objection Eicholtz made to Hurd's testimony occurred when she consulted a medical chart to testify about Jackson's initial complaints upon arriving at the hospital. (Tr. Vol. II at 341). Defense counsel did not specify the basis for this objection and made no other objections during approximately twenty pages of Hurd's direct examination testimony. The basis for counsel's general objection is not apparent from the record. Therefore, the alleged error is at least arguably waived. *See* Evid.R. 103(A)(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and * * * [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."). In any event, Hurd's testimony that Jackson complained of injuries resulting from an assault was merely cumulative of other evidence presented at trial. In fact, it was undisputed that Jackson's injuries were caused by an assault. The only question was whether Eicholtz assaulted her in their apartment or whether a woman assaulted her in a bar fight. Hurd's testimony did not address this issue. We see no reversible error.

{¶ 36} Finally, Eicholtz challenges the trial court's admission of Jackson's statements to Kathy Bendall, paramedic Kristi Morrison, paramedic Nick Thornton, deputy Chris Dolin, and family friend Elizabeth Fallon. Eicholtz argues that the statements were impermissible hearsay. We disagree. The record supports a finding that Jackson made the statements not long after jumping from the apartment window in her bra and underwear to escape from a lengthy

beating and that she remained in an excited state. At a minimum, the trial court did not abuse its discretion in concluding that the statements qualified as excited utterances. The third assignment of error is overruled.

{¶ 37} In his fourth assignment of error, Eicholtz argues that the trial court erred in allowing the State to impeach its own witness. This argument concerns the prosecutor's examination of Kathy Bendall. Eicholtz contends the State did not satisfy the requirements for attacking Bendall's credibility. Specifically, he claims the State failed to show that Bendall's trial testimony came as a surprise and caused affirmative damage to the prosecution's case, as required by Evid.R. 607(A).[6]

{¶ 38} "For purposes of the rule, a party demonstrates 'surprise' when the witness's trial testimony is materially inconsistent with the prior statement and counsel did not have reason to believe that the witness would repudiate the prior statement." *State v. Travis*, 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237 (2d Dist.), quoting *State v. Fisher*, 8th Dist. Cuyahoga No. 83098, 2004-Ohio-3123, ¶ 7. "Affirmative damage" exists when a prosecution witness's trial testimony contradicts, denies, or harms the State's case. It does not exist when a witness denies knowledge or fails to remember. *Dayton v. Combs*, 94 Ohio App.3d 291, 299, 640 N.E.2d 863 (2d Dist.1993).

{¶ 39} Here the State initially moved to have Kathy Bendall declared the court's witness under Evid.R. 614. The State withdrew the motion just before her testimony. However, in so doing, the prosecutor explained: "I've had an opportunity to talk to Kathy

---

[6] Rule 607(A) provides: "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage."

Bendall and discussed her penalty, and I will withdraw this motion. * * * I may need to revisit it at a later time if given * * * surprise." (Tr. Vol. I at 128). We construe that passage to mean that the prosecutor discussed the witness's anticipated testimony and the penalty for perjury, and was satisfied that the victim would testify consistent with her initial statements. Thereafter, the prosecutor commenced direct examination of Bendall. After a short period of questioning, the prosecutor sought permission to treat Bendall as a hostile witness. The request was based on the prosecutor's expression of surprise and a perception that Bendall was being dishonest when asked (1) whether Mike Billinghurst ever drank, (2) where in the house her young son slept, (3) what her step-daughter, Alisha, said upon seeing Eicholtz in the house, and (4) whether her husband told her she forgot to lock the door or stated, as a question, "You didn't lock the door?" (Tr. Vol. I at 153-162). Although the prosecutor appears to have been surprised by Bendall's answers, we doubt whether the responses to these largely collateral matters caused the requisite "affirmative damage" to the State's case. But even if the trial court erred in permitting the prosecutor to impeach Bendall on these limited issues, the error was harmless. The only significant discussion concerned whether Bendall's husband told her she didn't lock the door or questioned whether she had locked the door. We find no likelihood that the prosecutor's questioning on this point contributed to Eicholtz's conviction.

{¶ 40} The prosecutor later requested permission to treat Bendall as a hostile witness a second time when she denied seeing Eicholtz physically attack Billinghurst inside her house. (Tr. Vol. I at 168-169). The prosecutor told the trial court Bendall had stated earlier that morning that Eicholtz *did* assault Billinghurst inside the house. (*Id.* at 169). The trial court allowed impeachment of Bendall on this single issue. (*Id.* at 170). We see no error. The record

supports a finding of surprise based on the prosecutor's representation to the trial court. Moreover, Bendall's denial of an assault inside her house was damaging to the State's case because it potentially negated an element of the aggravated burglary charge.

{¶ 41} After the foregoing incident, the prosecutor treated Bendall as a cooperative witness while refreshing her recollection on several occasions. Finally, the prosecutor inquired about the existence of a sexual relationship between Bendall and Eicholtz and about Eicholtz possessing pictures of Bendall in the shower. (*Id.* at 191-192). Bendall answered these questions, denying a sexual relationship, and the prosecutor did not impeach her with any prior statement. Therefore, this line of questioning did not raise an Evid.R. 607(A) issue. The fourth assignment of error is overruled.

{¶ 42} In his fifth assignment of error, Eicholtz identifies nine instances of alleged prosecutorial misconduct extending from voir dire through closing arguments. He contends the misconduct deprived him of a fair trial.

{¶ 43} "'The test for prosecutorial misconduct is whether the prosecutor's acts were improper in their nature and character and, if they were, whether the substantial rights of the defendant to a fair trial were prejudiced thereby.'" *State v. Hauptstueck*, 2d Dist. Montgomery No. 24013, 2011-Ohio-3502, ¶ 11; quoting *State v. McGonegal*, 2d Dist. Montgomery No. 18639, 2001 WL 1346024, *2 (Nov. 2, 2001). Upon review, we see no prosecutorial misconduct.

{¶ 44} Eicholtz first contends the prosecutor improperly posed hypothetical situations to potential jurors during voir dire. The State used the hypotheticals to ensure that jurors would follow the law and return a guilty verdict if the evidence supported one, even if the

victim did not want the defendant prosecuted. The hypotheticals were relevant to the present case, where Kathy Bendall and Tabitha Jackson did not want to proceed with charges against Eicholtz. Although Eicholtz contends the hypotheticals obligated jurors to commit to the guilt of the perpetrator, the State merely ensured that jurors could vote to convict, despite the victim's wishes, if the evidence supported a conviction. We see no misconduct. *Cf. State v. Hazel*, 2d Dist. Clark No. 2011 CA 16, 2012-Ohio-835,  ¶25-30.

{¶ 45} Eicholtz next alleges misconduct based on the prosecutor introducing statements of Tom Eicholtz through other witnesses. As explained in our resolution of the fourth assignment of error above, the statements at issue were admissible as exceptions to the hearsay rule. Moreover, even if the statements were inadmissible, it is not misconduct for a prosecutor to introduce evidence that the trial court allows. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶187. We reach the same conclusion with regard to Eicholtz's third argument, which concerns the State's introduction of medical records. Given that the trial court allowed this evidence to be admitted, the prosecutor did not engage in misconduct by introducing it.

{¶ 46} Eicholtz's fourth argument concerns the prosecutor's failure to call as a witness the police officer who responded to Kathy Bendall's home. He reasons that the prosecutor's failure to call the officer as a witness suggests the wrongful exclusion of exculpatory evidence. He also argues that "not calling an otherwise available witness" constituted a violation of his right to confrontation. These arguments lack merit. We are unpersuaded that the prosecutor engaged in misconduct by not calling a witness. If Eicholtz believed the responding officer possessed important information, he could have subpoenaed

the officer himself.

{¶ 47} Eicholtz next alleges misconduct based on the prosecutor not disclosing exculpatory information until shortly before trial. This information concerned recantations by Tabitha Jackson to the prosecutor. The record belies the defendant's assertion that he did not became aware of the victim's recantations "until a few days prior to trial." Brief for the Appellant at 30. Tabitha Jackson testified that she went to the office of defense counsel on August 15, 2011, five months before the trial, and "told them that I lied on Jon." (Tr. 535). She then signed an affidavit to that effect. She further testified that she wrote letters to the prosecutor, judge, defendant, and counsel during November and December 2011 indicating that she had lied about what the defendant had done to her. (Tr. 531-538). The gist of her testimony and letters is that she had repeatedly informed the defendant that she had lied. Even assuming, arguendo, that the prosecutor delayed disclosing the recantations for some period of time, Eicholtz fails to show how he was prejudiced. Jackson was extensively cross-examined about her recantations during the trial, and defense counsel had the letters, and the affidavit, and questioned her about them. Eicholtz does not explain how his defense would have been different if he had known about the recantations earlier.

{¶ 48} Eicholtz's sixth argument concerns the prosecutor treating Kathy Bendall as a hostile witness and impeaching her testimony. We see no misconduct given that the trial court occasionally permitted the prosecutor to impeach Bendall. Eicholtz's seventh argument is equally unpersuasive. He alleges misconduct based on the prosecutor's failure to "designate an underlying 'crime' to meet the burden of proving the elements of Aggravated Burglary." In our analysis above, however, we found no error. We likewise find no misconduct.

{¶ 49} Eicholtz next alleges misconduct based on the prosecutor vouching for the credibility of witnesses. In the cited transcript pages, the prosecutor evaluated Jackson's testimony in light of the evidence presented. (Tr. Vol. III at 801-807). The prosecutor pointed out inconsistencies and urged the jury to consider a possible motive to lie based on Jackson's professed love for Eicholtz and her desire not to see him prosecuted. "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶232. We see no vouching here, where the prosecutor addressed Jackson's credibility in the context of the evidence and asked the jury to make its own determination as to her truthfulness.

{¶ 50} Finally, Eicholtz asserts that the prosecutor engaged in misconduct in a rebuttal argument by insinuating that he was lying and by expressing a personal opinion about his credibility. We see no misconduct. In rebuttal, the prosecutor pointed out that Eicholtz was the only witness who enjoyed the benefit of hearing all of the State's witnesses and seeing all the State's evidence. The prosecutor noted that all other witnesses had to wait in the hall until they testified. The prosecutor then argued, without objection, that Eicholtz was able to provide testimony that "fills all the holes." We see no plain error as a result of this statement. The prosecutor simply pointed out that Eicholtz was in a good position to lie, if he desired, because he had heard all the evidence. The jury was entitled to take this fact into consideration when assessing his credibility. Contrary to Eicholtz's argument, the cited transcript page does not depict an improper personal opinion by the prosecutor. The prosecutor told the jury to use its collective "reason and common sense" to decide what to believe. The fifth assignment of error is overruled.

{¶ 51} In his sixth assignment of error, Eicholtz maintains that the trial court abused

its discretion in imposing maximum and consecutive sentences. He argues that the statutory "seriousness" and "recidivism" factors do not support maximum, consecutive sentences. He also contends the record does not support a finding that the victim suffered serious physical and psychological harm. Finally, he asserts that the aggravated burglary involved a relative's house, that he had permission to enter, and that no one was harmed.

**{¶ 52}** We review a felony sentence using a two-step procedure. *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 4. "The first step is to 'examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law.'" *State v. Stevens*, 179 Ohio App.3d 97, 2008-Ohio-5775, 900 N.E.2d 1037, ¶ 4 (2d Dist.), quoting *Kalish* at ¶ 4. "If this step is satisfied, the second step requires that the trial court decision be 'reviewed under an abuse-of-discretion standard.' " *Id.*, quoting *Kalish* at ¶ 4.

**{¶ 53}** "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. Nelson*, 2d Dist. Montgomery No. 25026, 2012-Ohio-5797, ¶62. "However, the trial court must comply with all applicable rules and statutes, including R.C. 2929.11 and R.C. 2929.12." *Id*. "In addition, under 2011 Am.Sub.H.B. 86, the trial court is obligated to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences." *Id.*

**{¶ 54}** Here Eicholtz does not argue that his sentence is contrary to law. He argues only that the trial court's imposition of maximum and consecutive sentences constituted an abuse of discretion. We disagree. The record reflects that the trial court imposed consecutive

three-year prison sentences for abduction and domestic violence. The statutory maximum sentence for these offenses was three years under R.C. 2929.14(A)(3)(b). The trial court also imposed a consecutive four-year prison sentence for aggravated burglary, a first-degree felony. This four-year sentence was less than the statutory maximum.

{¶ 55} At the sentencing hearing, the trial court gave the following explanation:

All right. [R.C.] 2929.12(B) factors would make the defendant's conduct more serious. I do find that the victim suffered serious physical harm. There was some evidence of some psychological harm as well.

Under factors [that] would make his conduct less serious, I would say just with respect to the aggravated burglary, that he was acting under some provocation to the—not that anybody deliberately provoked him, but given the circumstances, of somebody else—him thinking somebody else was with his girlfriend, I suppose that's some significant provocation.

As far as recidivism factors, I do find that he has a history of criminal convictions that was set forth by the prosecutor. He's not responded favorably to any sanctions previously imposed. I don't find any genuine remorse, and I don't find any factors making recidivism less likely.

I do find that consecutive sentences are necessary to protect the public, to punish the offender and are not disproportionate to the conduct.

And that his criminal history shows consecutive sentences are needed to protect the public; and that the harm to the domestic violence victim was so great that a single term does not adequately reflect the seriousness of his

conduct.

(Disposition Tr. at 12-13).

{¶ 56} Upon review, we find no abuse of discretion in the trial court's weighing of the statutory seriousness and recidivism factors. Even without regard to psychological harm, the trial court reasonably could have concluded that Eicholtz inflicted serious physical harm on Jackson, who was knocked unconscious three times and experienced bruising all over her body as a result of being hit, kicked, and choked for hours. As for Eicholtz's claim that the aggravated burglary involved a relative's house, we recognize that his aunt, Kathy Bendall, resided there with her family. However, the jury's verdict and the State's evidence do not support his claim that he had permission to enter the house. As for Eicholtz's assertion that no one was harmed, the record reflects that he did attempt to harm Mike Billinghurst inside the house. In any event, we note that the trial court imposed a less-than-maximum sentence for the aggravated burglary conviction.

{¶ 57} With regard to the imposition of consecutive sentences, the trial court did not abuse its discretion in finding consecutive sentences necessary for the reasons it stated on the record. Specifically, the trial court reasonably imposed consecutive sentences based on Eicholtz's criminal history and lack of favorable response to prior sanctions, including prior imprisonment. The record also supports the trial court's finding that his criminal history made consecutive sentences necessary to protect the public and that consecutive sentences were necessary to punish Eicholtz and were not disproportionate to his conduct. Finally, the record supports the trial court's finding that the harm to Jackson was so great that a single prison term did not adequately reflect the seriousness of his conduct. The sixth assignment of error is

overruled.

{¶ 58}  In his seventh assignment of error, Eicholtz raises a claim of cumulative error. He contends the effect of the errors alleged in his first six assignments of error, even if individually harmless, cumulatively deprived him of a fair trial.

{¶ 59}  It is true that separately harmless errors may violate a defendant's right to a fair trial when the errors are aggregated. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 2000-Ohio-448, 721 N.E.2d 52. To find cumulative error, we first must find multiple errors committed at trial. *Id.* at 398. We then must find a reasonable probability that the outcome below would have been different but for the combination of separately harmless errors. *State v. Thomas*, 2d Dist. Clark No. 2000-CA-43, 2001 WL 1103328 (Sept. 21, 2001). In our review of Eicholtz's other arguments, we found at most a few instances of harmless error. Even considering these instances together, we find no prejudicial cumulative error. The seventh assignment of error is overruled.

{¶ 60}  The judgment of the Clark County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

FROELICH, J., concurring in judgment:

{¶ 61}  I would find parts of Tom Eicholtz's conversation with the deputy to be hearsay to which the excited utterance exception does not apply and to be violative of the defendant's confrontation rights.  Further, parts of Bendall's statements to the 911 operator appear to be hearsay and testimonial.  Lastly, parts of nurse Hurd's testimony, especially as it related to Jackson's reportedly having been held hostage, were not admissible.

{¶ 62} I am also concerned about the prosecutor's "tailoring" argument that the defendant was able to sit at trial, listen to other witnesses, and then "fill in the holes" (i.e., lie or "tailor" his testimony to what he heard); it was Eicholtz's constitutional right to be present at trial and to confront those who accused him.

{¶ 63} The U.S. Supreme Court has held that such generic tailoring arguments are acceptable under the Fifth, Sixth, and Fourteenth Amendments. *Portuondo v. Agard*, 529 U.S. 61, 73, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000). On the other hand, the highest courts in several states have held that such an argument is improper (though these holdings either preceded *Portuondo* or are based on state constitutions): *State v. Walsh*, 125 Haw. 271, 260 P.3d 350 (2011); *State v. Jones*, 580 A.2d 161 (Maine 1990); *State v. Gunwall*, 106 Wash.2d 54, 720 P.2d 808 (1986); *State v. Hemmingway*, 148 Vt. 90, 528 A.2d 746 (1987); *Commonwealth v. Person*, 400 Mass 136, 508 N.E.2d 88 (1987).

{¶ 64} And the only Ohio court to consider the question has sided with *Portuondo*. *State v. Griffin*, 6th District Lucas No. L-98-1215, 2000 WL 1713850 (Nov. 17, 2000), based on the U.S. Constitution.

{¶ 65} In a different trial and appellate case, some of these issues, either individually or cumulatively, could be dispositive. However, I agree with the majority that in light of all the testimony and evidence, the errors in admitting these statements, often without objection, let alone explained-objection, were harmless beyond a reasonable doubt.

. . . . . . . . . . . .

Copies mailed to:

Lisa M. Fannin
Jeremy M. Tomb
Hon. Douglas M. Rastatter